MDL 2 1 0 9

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 26 2009

FILED
~ CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| IN RE PLASMA-DERIVATIVE PROTEIN THERAPIES ANTITRUST LITIGATION | : : : | MDL DOCKET NO. ____ |

## MOTION OF PLAINTIFF HOSPITAL DAMAS, INC. FOR TRANSFER OF ACTIONS TO THE NORTHERN DISTRICT OF ILLINOIS PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS

### *Oral Argument Requested*

Hospital Damas, Inc. ("Movant"), plaintiff in an action styled *Hospital Damas, Inc. v. CSL Limited, et al.,* United States District Court for the Northern District of Illinois, Case Number 1:09-cv-5130, respectfully moves the Panel pursuant to 28 U.S.C. § 1407 and Rule 7.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation for an Order transferring to the Northern District of Illinois for coordinated or consolidated pretrial proceedings all actions (the "Pending Actions") listed on the Schedule of Actions (attached as Exhibit A) and any and all additional related actions that may be brought to the attention of the Judicial Panel on Multidistrict Litigation ("Panel"). The Pending Actions all involve Defendants CSL Limited, CSL Behring LLC and Baxter International Inc. ("Defendants").

As indicated in the Schedule of Actions, similar putative class actions are pending in the the Eastern District of Pennsylvania. As set forth below and in the accompanying Memorandum,

72428

**OFFICIAL FILE COPY**   IMAGED AUG 2 6 2009

PLEADING NO. 1

the Pending Actions satisfy the requirements for transfer and consolidation and/or coordination because they concern common questions of fact and law, and consolidation or coordination in the Northern District of Illinois would best serve the convenience of the parties and witnesses and will promote the just and efficient conduct of all actions.

In accordance with Rule 7.2, Movant submits a Memorandum in support of transfer and coordination or consolidation and the Schedule of Actions. For the Panel's reference and convenience, Movant also submits copies of the current Complaints filed in all known Pending Actions (attached as Exhibits B, C and D).

As set forth in more detail in the accompanying Memorandum, the grounds of this Motion are as follows:

1.  All Pending Actions arise from the Common Defendants' unlawful price-fixing of Plasma-Derivative Protein Therapies in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.  All Pending Actions allege similar or identical antitrust legal theories and seek class-wide equitable relief, damages, and reasonable attorneys' fees on behalf of a nationwide class of direct purchasers of Plasma-Derivative Protein Therapies.

3.  All Pending Actions were filed within the past few weeks and are in their infancy. Defendants have not filed a responsive pleading in any Pending Action.

4.  Transfer and coordination or consolidation of all Pending Actions and any future "tag-along actions" in the Northern District of Illinois will: (a) promote judicial economy; (b) eliminate the risk of inconsistent rulings on pretrial issues; (c) alleviate duplicative discovery; and (d) best serve the convenience of the parties, the witnesses, and the judiciary.

5.  The Northern District of Illinois is the most appropriate forum for transfer because: (i) the principal defendant, Baxter International Inc., is headquartered in the Northern

District of Illinois; (ii) the Defendant CSL Behring LLC operates its U.S. manufacturing facility in nearby Kankakee, Illinois; (iii) the Northern District of Illinois has the resources and ability to manage this litigation; and (iv) the Northern District of Illinois is convenient to and accessible by all litigants and witnesses.

WHEREFORE, Movant respectfully requests that the Panel enter an Order under 28 U.S.C. § 1407, transferring and coordinating or consolidating all Pending Actions, as well as any "tag-along actions" to the Northern District of Illinois for consolidated and/or coordinated pretrial proceedings and for all other appropriate relief.

Dated:  August 21, 2009                       Respectfully submitted,

                                              **HEINS MILLS & OLSON, P.L.C.**

                                              Vincent J. Esades
                                              Jessica N. Servais
                                              310 Clifton Avenue
                                              Minneapolis, MN  55403
                                              Tel:  (612) 338-4605
                                              Fax:  (612) 338-4692

                                              **FREED KANNER LONDON & MILLEN, LLC**
                                              Michael J. Freed
                                              Steven A. Kanner
                                              Doug A. Millen
                                              2201 Waukegan Road, Suite 130
                                              Bannockburn, IL  60015
                                              Telephone:  (224) 632-4500

72428                                    3

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 2 6 2009

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| IN RE PLASMA-DERIVATIVE PROTEIN THERAPIES ANTITRUST LITIGATION | : : : : | MDL DOCKET NO. ____ |

## EXHIBIT A
## SCHEDULE OF ACTIONS

| Caption | Date Filed | Case No. | District | Judge |
|---|---|---|---|---|
| **Plaintiff:**<br>Pemiscot Memorial Hospital<br><br>**Defendants:**<br>CSL Limited<br>CSL Behring LLC<br>Baxter International Inc. | 07/17/2009 | 2:09-cv-03143 | E.D. Pa. | Gene E. K. Pratter |
| **Plaintiff:**<br>Solaris Health Systems<br><br>**Defendants:**<br>Baxter International Inc.<br>CSL Limited<br>CSL Behring, LLC | 07/24/2009 | 2:09-cv-03342 | E.D. Pa. | Berle M. Schiller |
| **Plaintiff:**<br>Hospital Damas, Inc.<br><br>**Defendants:**<br>CSL Limited<br>CSL Behring LLC<br>Baxter International Inc. | 08/20/2009 | 1:09-cv-05130 | N.D. Ill. | Joan B. Gottschall |

72449



**GP**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

*FILED*

| | |
|---|---|
| PEMISCOT MEMORIAL HOSPITAL, on behalf of itself and all other similarly situated entities, | Civil Action No.: |
| Plaintiff, | **09   3146** |
| CSL LIMITED; CSL BEHRING LLC; and BAXTER INTERNATIONAL INC., | **CLASS ACTION COMPLAINT** |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Pemiscot Memorial Hospital ("Plaintiff"), individually and on behalf of a class of all others similarly situated, brings this action for treble damages under the antitrust laws of the United States against Defendants, and demands a jury trial.

### NATURE OF THE CASE

1.      Plaintiff alleges a multi-year nationwide conspiracy among Defendants and unnamed co-conspirators to restrict output and to fix, raise, maintain or stabilize the prices of Blood Plasma Proteins (defined below) sold in the United States.

2.      Defendants CSL Limited, CSL Behring LLC, and Baxter International LLC (collectively, "Defendants") develop, manufacture, and sell Blood Plasma Proteins, which are used primarily by hospitals like Plaintiff to treat critically ill patients suffering from, among other diseases, various immune disorders.

3.      Plaintiff alleges that Defendants conspired, combined or contracted to restrict output and to fix, raise, maintain or stabilize the prices of Blood Plasma Proteins that they sold to Plaintiff and the other Class members during the Class Period, a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  As a result of Defendants' unlawful conduct, Plaintiffs and the other Class members paid supra-competitive prices

1                    **EXHIBIT B**

for Blood Plasma Proteins, and thus suffered injury of the type the federal antitrust laws are designed to prevent.

4.      This lawsuit follows closely on the heels of the Federal Trade Commission's ("FTC") filing of an administrative complaint that sought to block CSL Limited's attempted acquisition of a smaller manufacturer of Blood Plasma Proteins, Talecris Biotherapeutics Holdings Corporation ("Talecris"), on the basis that the deal would substantially reduce competition in the United States for Blood Plasma Proteins, among other products.  Soon after the FTC filed its complaint, CSL chose to abandon the proposed acquisition.

5.      Significantly, in evaluating the anticompetitive effects that the deal would produce, the FTC discovered evidence from Defendants' own files that "suggests a strong possibility of ongoing coordinated interaction between firms in the plasma industry." The FTC has remarked that the redacted language in its Complaint "is similar to language that in other instances has been found to be evidence supporting an illegal price fixing conspiracy," thus could expose Defendants to "possible treble damages actions."  CSL currently is attempting to prevent the FTC from making this language public.

6.      The FTC's complaint describes, among other things, "troubling signs of coordinated behavior" that Defendants have undertaken, including signaling—*i.e.*, the intentional sharing of competitive information for purposes of seeking to ensure that manufacturers all are restraining output and curbing growth, thereby promoting higher prices.

7.      In particular, Defendants have used specific key words to:  (1) suggest to each other that increasing the production of Blood Plasma Proteins could hurt the firms'

ability to reap the significant profits that they all gained during an extended period where demand exceeded supply for these products; (2) remind each other of how, during a period when supply increased, prices and profitability for firms dropped substantially; and (3) encourage one another to increase supply only incrementally to keep pace with demand, and not increase supply to the extent the firms actually compete with one another for market share.

8.    In an FTC press release accompanying the filing of the lawsuit, the Director of the FTC's Bureau of Competition stated that "[s]ubstantial consolidation has already occurred in the plasma protein industry, and these highly concentrated markets are already exhibiting troubling signs of coordinated behavior." Moreover, the FTC alleged that if the proposed acquisition were approved, Defendants "would face no remaining significant obstacle in their efforts to coordinate and tighten supply conditions for the relevant products."

9.    As a result of the conspiracy, prices for Blood Plasma Proteins were higher than they otherwise would have been. Beginning in 2005 and continuing through the present, prices for Blood Plasma Proteins have increased substantially.

10.    As a result of Defendants' unlawful conduct, Plaintiff and all others similarly situated paid supra-competitive prices for these products, and have suffered injury to their business and property. Seeking recovery for the financial harm that the conspiracy has inflicted, Plaintiff brings this action on behalf of itself and all those similarly situated that purchased Blood Plasma Proteins in the United States directly from Defendants from October 1, 2004 through the present.

**JURISDICTION AND VENUE**

11.    Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries that Plaintiff and the other Class members have suffered pursuant to Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

13.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

14.    This Court has personal jurisdiction over each Defendant because each Defendant:  transacted business throughout the United States, including in this District; sold Blood Plasma Proteins throughout the United States, including in this District; had substantial contacts with the United States, including in this District; or engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

### PLAINTIFF

15.     Plaintiff Pemiscot Memorial Hospital is a non-profit corporation organized under the laws of the state of Missouri, with its principal place of business located in Hayti, Missouri.  During the Class Period, Plaintiff purchased Blood Plasma Proteins directly from one or more Defendants.  As a result of the conspiracy alleged, Plaintiff was injured in its business or property.

### DEFENDANTS

16.     Defendant CSL Limited is a company incorporated and domiciled in Australia, with its principal place of business located at 45  Poplar Road, Parkville, Victoria, 3052, Australia.   CLS Limited is the second-largest supplier of plasma-derivative protein therapies in the world.  It produces and sells biotherapies indicated for the treatment of several rare primary immune deficiency diseases, coagulation disorders, and inherited respiratory disease.  CSL Limited is a vertically integrated company.  It owns and operates one of the world's largest plasma collection networks, CSL Plasma, with collection facilities and laboratories in Boca Raton, Florida and Marburg, Germany. It also owns and operates manufacturing sites, through its wholly-owned subsidiaries, in Marburg, Germany and Bern, Switzerland.  CSL Limited's worldwide sales for its 2008 fiscal year were about $2.5 billion.

17.     Defendant CSL Behring LLC is a wholly-owned U.S. subsidiary of CSL Limited and is headquartered at 1020 First Avenue, King of Prussia, Pennsylvania 19406-0901.  CSL Behring is the second largest producer of plasma products in the United States.  CSL Behring's products are indicated for the treatment of coagulation disorders

including hemophilia and von Willebrand disease, primary immune deficiencies, and inherited respiratory diseases.   Its products also are used in cardiac surgery, organ transplantation, and burn treatment, and for the prevention of hemolytic diseases in newborns.  CSL Behring has a manufacturing site in Kankakee, Illinois.  CSL Behring's sales revenue was approximately $1.8 billion for its 2008 fiscal year.

18.    Defendant Baxter International Inc. is a global, diversified healthcare company that incorporated in Delaware and has its principal place of business at One Baxter Parkway, Deerfield, Illinois 60015.  Baxter is the largest producer of plasma-derivative protein therapies in the world, and is the largest producer of plasma products in the United States.    Baxter is divided into three business segments:  BioScience; Medication Delivery; and Renal.   The BioScience business manufactures and sells, among other products, recombinant and plasma-based proteins to treat hemophilia and other bleeding disorders, and plasma-based therapies to treat immune deficiencies, alpha 1-antritrypsin deficiency, burns and shock, and other chronic and acute blood-related conditions.  Baxter maintains 15 manufacturing facilities in the United States and its territories, as well as facilities in 23 other countries.  Its BioScience segment has 11 manufacturing sites domestically and abroad, including sites in Hayward, Thousand Oaks, and Los Angeles, California and in Beltsville, Maryland.   In 2008, Baxter's revenues exceeded $12.3 billion, and it derives about 20% of its sales from plasma products.

## CO-CONSPIRATORS

19.    Various other individuals, firms and corporations, not named as Defendants herein, may have participated as co-conspirators with Defendants and

performed acts and made statements in furtherance of the conspiracy. Plaintiff reserves the right to name subsequently some or all of these persons as defendants.

20.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

<u>CLASS ACTION ALLEGATIONS</u>

21.     Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons and entities in the United States who purchased Blood Plasma Proteins directly from any Defendant at any time from at least as early as October 1, 2004 through the present. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies, and instrumentalities.

22.     Plaintiff believes that there are thousands of Class members, the exact number and their identities being known by Defendants, making the Class so numerous and geographically dispersed that joinder of all members is impracticable.

23.     There are questions of law and fact common to the Class, including:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to restrict output and to fix, raise, maintain or stabilize the prices of Blood Plasma Proteins sold in the United States;

(b)     The identity of the conspiracy's participants;

7

(c)     The duration of the conspiracy alleged in this Complaint and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

(e)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and the other Class members;

(f)     The effect of the conspiracy on the the prices of Blood Plasma Proteins sold in the United States during the Class Period; and

(g)     The appropriate Class-wide measure of damages.

24.     Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the antitrust laws in that they paid artificially inflated prices for products purchased directly from Defendants or their con-conspirators.  Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other Class members.   Plaintiff's interests are coincident with, and not antagonistic to, those of the other Class members.

25.     Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

26.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

27.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

28.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This class action presents no difficulties in management that would preclude maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

29.    The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

30.    During the Class Period, Defendants and their co-conspirators sold substantial quantities of Blood Plasma Proteins in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

31.    The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## FACTUAL ALLEGATIONS

## THE PLASMA-DERIVATIVE PROTEINS INDUSTRY

### Background

32.     The manufacturing process for plasma-derivative proteins involves: (1) plasma collection; (2) plasma testing; (3) fractionation (*i.e.*, precipitation of solids by manipulation of solution pH, temperature, etc.); (4) finishing or purification; (5) quality control; and (6) lot release.  The time required to complete the full manufacturing process ranges from approximately seven months to one year.

33.     The manufacturing process is highly regulated because plasma products run the risk of containing and transmitting infections.  Regulatory bodies include the United States Food and Drug Administration ("FDA"), state regulatory agencies, and the Plasma Protein Therapeutics Association, an industry self-regulatory body.

34.     Plasma-derivative proteins are essential for treating a number of serious illnesses, including immune deficiency diseases, coagulation disorders, and respiratory diseases.  The annual cost for such treatments can exceed $90,000 per patient in some cases.

35.     Purchasers of plasma-derivative proteins—usually hospitals through contracts negotiated by Group Purchasing Organizations—will pay very high prices if necessary to make treatment available to critically ill patients.  Consequently, small changes in production levels cause dramatic swings in prices for products, and producers stand to increase profits greatly by controlling output relative to demand.

36.     The most prominent plasma-derivative proteins are:  (1) Ig; (2) albumin; (3) alpha-1; and (4) Rho-D.  The relevant plasma-derivative protein products for purposes of this Complaint are Ig and albumin ("Blood Plasma Proteins").

## Relevant Product Markets

### Ig

37.    Ig is a widely used drug that can be administered intravenously ("IVIG" or "IGIV") or subcutaneously ("SCIG"). IVIG, the more predominant form, has over 20 FDA-approved indications, and as many as 150 off-label uses. Ig products are antibody-rich plasma therapies that long have been used in the treatment of primary immune deficiencies (to provide antibodies a patient is unable to make) and certain autoimmune disorders where it is believed to act as an immune modulator. In addition, physicians frequently prescribe Ig for a wide variety of diseases, although these uses are not described in the product's labeling and differ from those tested in clinical studies and approved by the FDA or other regulatory agencies in other countries. These unapproved, or "off-label," uses constitute the preferred standard of care or treatment of last resort for many patients in varied circumstances.

38.    Ig represents the largest plasma-derived protein product by value. It is estimated that 70% of IVIG sold in the United States in 2007 was purchased by hospitals through contracts negotiated with GPOs. Physician offices represented about 13% of IGIV volume, and homecare companies and specialty pharmacies represented about 17% of IGIV volume.

39.    Ig constitutes a relevant product market.

40.    There are no good substitutes for Ig.

### Albumin

41.    Albumin is the most abundant protein in human plasma. It is synthesized by the liver and performs multiple functions, including the transport of many small

molecules in the blood and the binding of toxins and heavy metals, which prevents damage that they otherwise might cause. Albumin is used to expand blood volume and to prime heart values during surgery.

42.     Albumin generally is used in surgical and trauma settings and typically is sold to hospital groups.

43.     Albumin constitutes a relevant product market.

44.     There are no good substitutes for albumin. Physicians and hospitals regard albumin as far superior from a clinical standpoint to any potential alternatives, such as hetastarch and saline products.

### Relevant Geographic Market

45.     The relevant geographic market is the United States.

46.     Like pharmaceutical products, each Blood Plasma Protein must be approved for sale in the United States by the FDA. To obtain approval, the products must be produced from plasma collected in the United States at collection centers approved by the FDA. The products also must be manufactured at plants approved by the FDA.

47.     Performing the requisite clinical trials and undergoing the FDA approval process for plasma and plasma-derivative products, including Blood Plasma Proteins, takes well over two years. Accordingly, Blood Plasma Proteins sold outside of the United States are not viable competitive alternatives for United States customers, who cannot buy these products even in the event of a price increase for products available in the United States.

### Market Characteristics

48.     The structure and characteristics of the Blood Plasma Proteins markets in the United States are particularly conducive to a price-fixing agreement, and have made collusion particularly attractive in this market.  These factors are discussed below.

### Commodity-Like Products

49.     A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers both to agree on prices for the product and to monitor these prices.

50.     Blood Plasma Proteins are homogeneous, commodity-like products within a given product category (*e.g.*, Albumin or Ig), and one Defendant's Blood Plasma Proteins easily can be substituted for a Blood Plasma Protein made by the other Defendant.  Indeed, Talecris, a competitor of Defendants, noted in a 2008 SEC filing that "[a]mong albumin products, competition is generally based on price, given that the products tend to be homogeneous."

51.     Because Blood Plasma Proteins are commodity-like products, purchasers make purchase decisions based predominantly, if not entirely, on price.

### Lack of Substitutes

52.     The lack of available substitutes for a product also helps facilitate an effective price-fixing conspiracy.  Without substitutes, producers of the product can raise prices without losing significant sales to closely competing products.

53.     For hospitals, physicians, and others that use Blood Plasma Proteins, there simply are no suitable substitutes for these products, at any price.  They must purchase

Blood Plasma Proteins regardless of the price; nothing else will do.  Indeed, as Patrick Robert of the Marketing Research Bureau Inc. has noted, "therapeutic plasma proteins [including Blood Plasma Proteins] remain essential life-saving drugs for which there is still no competitive drug."

### Industry Concentration

54.     A high degree of concentration facilitates coordination among co-conspirators.

55.     Defendants control a high percentage of the United States plasma-derivative protein industry, collectively possessing about a 60% market share.  In particular, Baxter controls about 36% of the market, and CSL controls about 24% of the market.  The remaining manufacturers, Talecris, Grifols USA ("Grifols"), and Octapharma USA, Inc. ("Octapharma"), possess shares of approximately 23%, 7% and 5%, respectively.

56.     With respect to the domestic Ig market, according to 2008 sales volumes, Defendants collectively possess approximately a 62.9% market share.  CSL has about a 27.5% market share, and Baxter has about a 35.4% market share.   The remaining manufacturers, Talecris, Grifols, and Octapharma, possess shares of approximately 20%, 9% and 7.2%, respectively.  The market is highly concentrated, with a Herfindahl-Hirschman Index ("HHI") of 2,579.   (The HHI test is used by the FTC and DOJ to gauge market concentration.   An industry with an HHI exceeding 1,800 is deemed "highly concentrated.")

57.     With respect to the domestic albumin market, according to 2008 sales volumes, Defendants collectively possess approximately a 73.05% market share.  CSL possesses about a 36.61% market share, and Baxter maintains about a 36.44% share.  The

remaining competitors, Talecris, Grifols, and Octapharma, possess shares of 8.83%, 13.06%, and 5.07%, respectively.    The market is highly concentrated, with an HHI of 2,942.

58.    Throughout the Class Period, Defendants collectively possessed market power to raise prices above competitive levels in the Blood Plasma Proteins markets in the United States without losing appreciable market share to non-conspirators.

**Barriers to Entry**

59.    The presence of significant entry barriers to potential competitors that could otherwise cause the incumbents to reduce their prices helps facilitate coordination among co-conspirators.

60.    The market for Blood Plasma Proteins is characterized by high entry barriers.  Indeed, no firm has entered *de novo* in recent history, and prospective entrants have little chance of making a meaningful market impact in a timely fashion.

61.    Each step of the manufacturing process for Blood Plasma Proteins involves substantial up-front, sunk costs, onerous and lengthy regulatory approvals by federal and state agencies, and specialized technical know-how and expertise.

62.    Entry into the Blood Plasma Proteins markets requires a significant amount of intellectual property, including trade secrets relating to purification of products and pathogen safety, and substantial product research and development.

63.    Regulatory hurdles impose significant barriers to entry and extend the time it would take to enter the United States markets, let alone make a significant impact in the markets.

64.     In addition, the construction and maintenance of production facilities, including regular improvements necessitated by evolving standards of manufacturing practices, requires extensive capital expenditures and may involve long lead times to obtain the necessary governmental approval.

65.     Any new competitors in the United States also would need to secure an adequate supply of domestic plasma because only plasma collected in the United States is certified for use in products sold domestically.  Because there currently are only a very limited number of independent plasma suppliers, most of whose plasma collection and center development capacity is already contracted to existing manufacturers, any new competitor likely would have to develop its own domestic-based plasma collection centers and related infrastructure.

**Demand Inelasticity**

66.     Price elasticity of demand is the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.  Inelastic demand is another indicator that a price-fixing conspiracy would be successful.

67.     The demand for Blood Plasma Proteins is highly inelastic.  Blood Plasma Proteins are considered medical necessities that must be purchased by hospitals, physicians, and others at whatever the cost.  Moreover, there are no close substitutes for these products.

## Opportunity for Conspiratorial Communications

68.     Defendants are members of trade associations and regularly attend meetings together.

69.     For example, Defendants are members of the Plasma Protein Therapeutics Association ("PPTA").  The PPTA is "the primary advocate for the world's leading source plasma collectors and producers of plasma-based and recombinant biological therapeutics."  Defendants are Global, North American, and European Members of the association, and their high-level executives, including Peter Turner, President of CSL Behring, and Larry Guiheen, President of Baxter BioScience, serve on the association's Global Board of Directors.  Mr. Turner also serves as the association's president.  The PPTA convenes its annual meeting, known as the Plasma Protein Forum, in June in the Washington, D.C. metropolitan area, and high-level executives from Defendants, such as Messrs. Turner and Guiheen, routinely attend.

70.     Such trade association meetings provide the opportunity for participants in price-fixing conspiracies such as this one to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.

## Market Dynamics During Late 1990's-Early 2000's

71.     In the late 1990's, a series of events brought about by temporary plant closures, following FDA intervention, resulted in extensive change in supply for both the domestic and global plasma-derivative protein products industries.

72.     In 1997, in the wake of a recall of albumin produced by a company called Centeon, the FDA mandated the temporary closure of the plant then owned by Centeon at

Kankakee, Illinois (which CSL Limited now owns).  In 1999, the Alpha Therapeutic Corporation plant in Los Angeles, California (which CSL Limited also now owns) was temporary closed.  The shortages that resulted from these disruptions, particularly concerning Ig supply, caused higher prices in the United States market, spurring producers to increase plasma collections as well as output of Blood Plasma Proteins.

73.    Between 2000 and 2003, however, once the Kankakee and Los Angeles facilities had recommenced production, there was an oversupply of Blood Plasma Proteins. This led to dramatic price declines and, in turn, to a 30% reduction in gross operating margins among producers.  Due to fixed costs representing a high proportion of the total costs of Blood Plasma Proteins production, this translated into a significant downturn in profits for the industry.

74.    This period of excess supply, in turn, resulted in another significant change in the industry, causing the remaining producers to reduce production and plasma collection capacity and to begin in earnest to vertically integrate.

## Industry Consolidation

75.    In 1990, there were 13 producers of plasma-derivative protein products.  In 2003, that number dropped to nine.  Since 2005, there have been only five:  CSL, Baxter, Talecris, Grifols, and Octapharma.

76.    Several firms recently merged or were acquired.  The large, integrated suppliers, most notably Defendants, have acquired numerous independent plasma collectors and facilities, and continue to do so.  And soon after acquiring them, Defendants shut down many of them.

77.     CSL Limited acquired the Swiss Red Cross fractionator, ZLB, as well as 47 plasma collection centers from Nabi, in July 2000.  It acquired Aventis Behring's plasma products business in 2003.  CSL Limited subsequently closed 35 plasma collection centers in the United States, reduced plasma collections by 1 million liters, and reduced plant output by 1.1 million liters.

78.     Baxter acquired 42 plasma collection centers and a laboratory from Alpha Therapeutic Corporation (Mitsubishi Pharma) in late 2002.  Baxter subsequently closed 26 of its own plasma collection centers and 38 collection centers that it acquired from Alpha Therapeutic, as well as a plant in Rochester, Michigan.

79.     As one investment firm with knowledge of the industry has noted, "[a]bout 80% of the [plasma collection] centers are now owned by plasma-products companies such as Baxter International, CSL Limited, Grifols, and Talecris Biotherapeutics.  This represents a complete reversal in ownership since 2000, when 80% of the centers were independent enterprises."

80.     In 2005, a major non-profit entity, the American Red Cross, exited the plasma products industry.

81.     The plasma products industry as it now exists has significantly fewer suppliers than it did even six years ago.  The remaining suppliers, most notably among them Defendants, are larger and more vertically integrated than ever before.

## THE CONSPIRACY

82.     As consolidation has occurred in the plasma-derivative protein products industry, supply has been limited in the face of increasing demand, and prices consequently have increased in recent years.  GPOs, hospitals, physicians—and ultimately patients—

have experienced tightening supplies and rising prices.  The restriction of supply and increase in prices for Blood Plasma Proteins began in 2005 and has continued through the present.

83.    The restriction of supply and increase in prices was not the result of natural market forces.  Rather, they were caused by Defendants' conspiracy, which Defendants formed in response to the excess supply that occurred earlier in the decade and that Defendants did not want to experience again.

84.    Indeed, Baxter explained in a recent investor call how competitors have *"lived through the events of the early 2000's,"* referring to the period of excess supply and lower prices, and now have returned to a time of "very good stock prices and very good returns for shareholders."  Similarly, at the 2007 Plasma Protein Forum, held June 5-6 at the Hyatt Regency in Reston, Virginia, and attended by numerous industry executives, including those of Defendants, Peter Turner, PPTA Chairman and President of CSL Behring, "declared *the industry to be in 'good shape' after a few bumps in the road in years past.*"

85.    Defendants implemented their illegal agreement by coordinating and restricting output and by signaling to one other and to other competitors to do the same. Indeed, during and after the period of excess capacity earlier in the decade, Defendants recognized that controlling capacity was critical to preventing price competition.

86.    A key element of the conspiracy was Defendants' focus on the prevention of oversupply of Blood Plasma Proteins and plasma in the marketplace.  For example, Baxter has recognized that as long as competitors are not *"irrational"* and do not *"trash*

*price and take share*," then they can increase supply steadily in line with market demand to keep prices high.

87.     Competitive information is widely available from industry sources and the competitors themselves.  Firms closely monitor each others' activities with respect to plasma collection, manufacturing, and output, and firms collect and catalogue an extraordinary wealth of timely competitive information.

88.     Defendants have taken advantage of this timely competitive information not only by monitoring their competitors' activities, but also by engaging in signaling— *i.e.*, the intentional sharing of competitive information for purposes of seeking to ensure that manufacturers all are restraining output, curbing growth, and maintaining high prices.

89.     In particular, Defendants have used specific key words to:  (1) suggest to each other that increasing the production of Blood Plasma Proteins could hurt the firms' ability to reap significant profits that they all gained during an extended period where demand exceeded supply for these products; (2) remind each other of how, during a period when supply increased, prices and profitability for firms dropped substantially; and (3) encourage one another to increase supply only incrementally to keep pace with demand, and not increase supply to the extent the firms actually compete with one another for market share.

90.     Baxter's CFO acknowledged Defendants' signaling in a recent investor call:  "Why any of us would, for a very short-term gain, do anything to change [the current marketplace dynamics], I just don't see why we would.  It wouldn't make any sense and *from everything we read and all the signals we get, there is nothing that says*

*anyone would do that. I think people are very consistent in the messages they deliver, which are pretty consistent with what we have told you today.*"

91.     Another aspect of the conspiracy was the rationing of supply to purchasers.   In 2006, the Department of Health and Human Services ("HHS") investigated reports that patients were experiencing problems purchasing Ig.  HHS stated that Ig *"[m]anufacturers are currently allocating IGIV to their customers.  Under this allocation system, most customers are expected to justify their current IGIV use to the manufacturer to maintain and/or increase their allocations.   In economic terms, current IGIV supplies are being rationed.*"  HHS also noted that "[t]he existence of a secondary market with high IGIV prices combined with a manufacturer instituted allocation system for IGIV are symptomatic of a market in which demand exceeds supply."   HHS concluded that a majority of hospitals surveyed could not purchase enough IGIV to meet all of their patient needs, and calculated that the shortfall of supply relative to demand was approximately 14%.

92.     Defendants have explored means of punishing firms, most notably Talecris, that have attempted to buck the prevailing restrained industry approach by increasing output.

93.     Talecris is the one firm in the industry that potentially could thwart the prevailing restrained approach that Defendants successfully have advocated and implemented thus far.  Indeed, according to the FTC, Talecris is "the one firm that has consistently and significantly expanded output in the United States."  Moreover, Talecris recently stated in a 2008 SEC filing that it "intend[s] to serve the overall market growth with incremental increases in production capacity" in 2008 and 2009.

94.     In a further attempt to reduce industry production capacity and maintain high prices and margins, CSL Limited recently attempted to acquire Talecris.  In an unusual move for a company whose competitor was contemplating a key acquisition, Baxter publicly expressed its view that CSL Limited's attempted acquisition of Talecris would be "*a positive stabilizing move within the industry.*"  The FTC subsequently sought to block the attempted acquisition.  (The FTC action is discussed in depth below.)

96.     Defendants' agreement to restrict supply and raise prices has been assisted by increased industry consolidation and the resulting oligopolistic market structure.  The remaining participants have recognized that they are operating in an oligopoly where they are better off avoiding competition, restricting supply, and raising prices.

97.     Defendants' conspiracy has worked.  Beginning in 2005 and continuing through the present, prices for Blood Plasma Proteins consistently have increased.

98.     The average sales price for a gram of IVIG has increased from about $47.60 in 2005 to about $57 in 2009, according to an analyst presentation that Grifols gave on March 5, 2008.  The same presentation stated that "IVIG, which remains the driver of the plasma derivatives market, has witnessed price increases since 2005, coinciding with increased demand related to product availability."

99.     The average sales price for a gram of albumin has increased from about $1.25 in 2005 to about $2.20, according to the same Grifols presentation.  The presentation also reports that "average albumin prices have steadily increased since 2005 from U.S. $14 to around U.S. $35 per 12.5 g. vial at present."  A Talecris 2008 SEC filing similarly notes that "[p]rices for albumin have increased significantly since 2005 . .

. . The average selling price in 2007 was $28.55, having grown at a CAGR of 35% since 2005, when the U.S. average selling price (ASP) was $15.58."

100.    Defendants' contemporaneous business reports have borne out these facts. For example, CSL Limited reported in its October 2004 Annual General Meeting presentation:  "IVIG - prices have been stable with upward pressure going forward; currently experiencing solid demand;" and "Albumin - prices stable after period of weakness; inventory oversupply reducing."  In its October 2005 Annual General Meeting presentation, CSL Limited remarked that "US IVIG pricing environment improving," and that with respect to the CSL Behring, it is "managing plasma throughput to match:  run down in inventory benefit; reduction of inventory levels; [and] demand."  The Chairman's Address from the same 2005 meeting stated that CSL "Behring is well positioned to develop its global business through," among other things, "an effective balance between supply and demand."  And in its October 2006 Annual General Meeting presentation, CSL Limited noted both that the "strong global demand for plasma therapies continues," and "plasma sector stability."

101.    Defendants' conspiracy has resulted not only in supracompetitive pricing, but also extraordinary profits for Defendants, even as most other industries have experienced drastically lowered earnings in the face of the global economic crisis.

102.    According to a March 2009 report issued by CSL's chairman, CSL experienced a post-tax net profit of $502 million for the half-year ended December 31, 2008, an increase of 44% from the same period last year.  The report also notes that "[t]he global financial crisis has had little to no impact so far on sales of CSL's portfolio of life-

saving therapies and essential vaccines . . . . [a]nd we anticipate broadly stable market conditions to continue."

103.    CSL Behring sales revenue increased 33% to $1.8 billion compared with the same period the previous year, "with strong contributions from both core and specialty plasma products," according to the same March 2009 CSL report.

104.    Revenues from Baxter's BioScience unit climbed 12% to $1.36 billion in 2008, largely pursuant to sales of plasma-based hemophilia and immune disorder treatments, vaccines and biosurgery products. Due to the profit its BioScience unit has generated, one news article has noted that "Baxter is one of a handful of stocks that have proven somewhat resistant to the global recession."

### FTC INVESTIGATION

105.    On March 27, 2009, the FTC authorized a lawsuit to block CSL Limited's proposed $3.1 billion acquisition of Talecris, charging that the deal would be illegal and substantially would reduce competition in the United States markets for Ig, albumin, Rho-D, and Alpha-1. On the same day, the FTC also sought a preliminary injunction in federal district court in the District of Columbia to stop the transaction pending completion of an administrative trial.

106.    In an FTC press release accompanying the filing of the lawsuit, Richard Feinstein, Director of the FTC's Bureau of Competition, stated that "[s]ubstantial consolidation has already occurred in the plasma protein industry, and *these highly concentrated markets are already exhibiting troubling signs of coordinated behavior.*"

107.    The FTC described in its complaint, among other things, "*troubling signs of coordinated behavior*," including Defendants' signaling, product rationing, and other public statements and actions indicative of anticompetitive conduct.

108.    The FTC alleged that, "with the elimination of Talecris— the one firm that has consistently and significantly expanded output in the United States—*CSL and Baxter International, Inc. ("Baxter") would face no remaining significant obstacle in their efforts to coordinate and tighten supply conditions* for the relevant products, to the great detriment of consumers."

109.    Notably, numerous sentences and parts of sentences from the FTC complaint have been redacted from public viewing.  The FTC has moved to file an unredacted version of the complaint.

110.    The FTC has stated that the redacted "language suggests *a strong possibility of ongoing coordinated interaction between firms in the plasma industry*. Evidence of transparency, interdependence, and signaling among firms is particularly relevant to the allegations in this matter.  The language at issue bears on these very important points, and demonstrates how firms used specific key words to:

- suggest to each other that increasing the production of lifesaving drugs could hurt the firms' ability to reap the significant profits they all achieved during an extended period where demand exceeded supply for the key products;

- remind each other of how, during a period when supply increased, prices and profitability for the firms in the market dropped significantly; and

- encourage each other to only increase supply incrementally to keep pace with demand, not increase supply to the extent the firms actually compete with each other for market share."

111.   The FTC also has noted that the redacted "*quoted language . . . . is similar to language that in other instances has been found to be evidence supporting an illegal price fixing conspiracy. See, e.g., In re High Fructose Corn Syrup Antitrust Litigation,* 295 F.3d 651, 662 (7th Cir. 2002) (Posner, J.) (referring to competitor as a 'friendly competitor,' mentioning an 'understanding between the companies that . . . causes [them] not to . . . make irrational decisions,' and querying whether competitors 'will play by the rules (discipline)' can all be evidence of an explicit agreement to fix prices)."

112.   CSL Limited has opposed the FTC's motion to file an unredacted version of the complaint, claiming that every quote in the complaint derived from the respondents' documents constitutes confidential business information, and that disclosure of this information irreparably would harm their reputations.  The FTC has responded by stating that the redacted material does not qualify as confidential business information, and that while disclosure of the material would cause "*embarrassment*" and "*could 'expose respondent to possible treble damages actions,*'" those reasons are not sufficient to prevent disclosure.

113.   Shortly after the filing of the FTC complaint, on June 8, 2009, CSL Limited and Talecris publicly announced that they would abandon the proposed merger. On June 15, 2009, the FTC and the two firms jointly filed a motion to dismiss the FTC's complaint on that basis, and on June 22, 2009, the FTC dismissed the complaint.

114.   There has been no ruling yet on the FTC's motion to file an unredacted version of the complaint.  Significantly, the FTC has not abandoned its position, and

believes that the public interest would best be served by full disclosure of the redacted language.

## ANTITRUST VIOLATIONS

115.    Beginning at least as early as October 1, 2004, and continuing through the present, Defendants and their co-conspirators engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to restrict output and to artificially raise, fix, maintain or stabilize the prices of Blood Plasma Proteins in the United States.

116.    Based on the foregoing, and on information and belief, in formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to restrict output and to artificially raise, fix, maintain, or stabilize the price of Blood Plasma Proteins sold in the U.S.  These activities included:

(a)    Defendants participating in conversations or communications to discuss the supply and price of Blood Plasma Proteins in the United States;

(b)    Defendants agreeing during those conversations or communications to restrict output and to charge prices at specified levels and otherwise to increase or maintain prices of Blood Plasma Proteins sold in the United States; and

(c)    Defendants agreeing during those conversations or communications to restrict output and to fix or stabilize prices of Blood Plasma Proteins sold in the United States; and

117.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in the Complaint.

118.   Throughout the Class Period, Plaintiff and the other Class members purchased Blood Plasma Proteins from Defendants (or their subsidiaries or controlled affiliates) or their co-conspirators at supra-competitive prices.

119.   Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## EFFECTS OF THE CONSPIRACY

120.   As a result of Defendants' unlawful conduct, Plaintiff and the other Class members have been injured in their business and property because they have paid more for Blood Plasma Proteins than they would have paid in a competitive market.

121.   The unlawful contract, combination or conspiracy has had at least the following effects:

(a)   price competition in the markets for Blood Plasma Proteins has been artificially restrained;

(b)   prices for Blood Plasma Proteins sold by Defendants have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

(c)   purchasers of Blood Plasma Proteins from Defendants have been deprived of the benefit of free and open competition in the Blood Plasma Proteins markets.

## FRAUDULENT CONCEALMENT

122.   Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until May 27, 2009, when the FTC's redacted complaint was filed.

123.    Because Defendants' alleged conspiracy was kept secret until May 27, 2009, Plaintiff and members of the Class before that time were unaware of Defendants' unlawful conduct alleged herein, and they did not know before that time that they were paying supra-competitive prices for Blood Plasma Proteins throughout the United States during the Class Period.

124.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

125.    By their very nature, Defendants' conspiracy was inherently self-concealing.  Blood Plasma Proteins are not exempt from antitrust regulation, and thus, before May 27, 2009, Plaintiff reasonably considered it to be a well-regulated, competitive industry.

126.    In the context of the circumstances surrounding Defendants' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' pricing was conspiratorial. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' proffered Blood Plasma Proteins prices before May 27, 2009.

127.    Plaintiff and members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and fraudulently conceal their conspiracy.

128. Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until May 27, 2009, when the FTC complaint, and its corresponding factual allegations of anti-competitive conduct concerning Blood Plasma Proteins, was first publicly disseminated.

129. None of the facts or information available to Plaintiff and members of the Class prior to May 27, 2009, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to that date.

130. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and members of the Class have alleged in this Complaint.

131. Defendants and their co-conspirators engaged in a successful anti-competitive conspiracy concerning Blood Plasma Proteins, which they affirmatively concealed, at least in the following respects:

(a) By communicating secretly to discuss output and prices of Blood Plasma Proteins in the United States; and

(b) By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme.

132. As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Plaintiff's and the Class' claims have been tolled.

## CAUSE OF ACTION

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT -15 U.S.C. § 1

133.   Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

134.   Beginning at least as early as October 1, 2004, and continuing thereafter, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to restrict output and to artificially raise, fix, maintain, or stabilize prices for Blood Plasma Proteins in the United States in violation of Section 1 of the Sherman Act , 15 U.S.C. § 1.

135.   Plaintiff and the other Class members have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiff and Class members have paid more for Blood Plasma Proteins than they otherwise would have paid in the absence of Defendants' conduct.  This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

136.   Accordingly, Plaintiff and Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys fees.

## DEMAND FOR JURY TRIAL

137.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

B.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.     That judgment be entered for Plaintiff and Class members against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law.

D.     That Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law.

E.     That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law.

F.     That Defendants be enjoined from continuing their participation in the alleged conspiracy.

G.     For such other and further relief as is just and proper under the circumstances.

Dated:  July 15, 2009

Marc I. Machiz (PA Bar No. 92570)
Cohen Milstein Sellers & Toll PLLC
255 South 17th Street
Suite 1307
Philadelphia, PA  19103
Telephone:  (267) 773-4680
Facsimile:  (267) 773-4690
E-mail: mmachiz@cohenmilstein.com

Daniel A. Small
Richard A. Koffman
Kit A. Pierson
Benjamin D. Brown

Christopher J. Cormier
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, NW
Suite 500 West
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
E-mail:dsmall@cohenmilstein.com
        rkoffman@cohenmilstein.com
        kpierson@cohenmilstein.com
        bbrown@cohenmilstein.com
        ccormier@cohenmilstein.com

Mike Ponder
Cook, Barkett, Maguire & Ponder, L.C.
715 N. Clark, P.O. Box 1180
Cape Girardeau, MO  63702-1180
Telephone: (573) 335-6651
Facsimile:  (573) 335-6182
E-mail: mponder@cbmplaw.com
*Attorneys for Plaintiff*

$350

BMS

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

SOLARIS HEALTH SYSTEMS,
on behalf itself and all other
similarly situated entities,

                   Plaintiff

           v.

BAXTER INTERNATIONAL INC.,
CSL LIMITED; and
CSL BEHRING, LLC

                Defendants

Civil Action No.:

**09    3 4 4**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

# FILED

JUL 2 4 2009

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

Solaris Health Systems, Inc. ("Solaris"), individually and on behalf of a class of all other

direct purchasers similarly situated, brings this action for declaratory injunctive relief, damages,

and/or restitution pursuant to the antitrust laws set forth below against CSL Limited, CSL

Behring LLC, and Baxter International Inc. (collectively, "Defendants"). Plaintiff alleges as

follows upon information and belief:

## NATURE OF THE ACTION

1.     This action arises out of a conspiracy among the leading manufacturers

of Plasma Derivative Products (as defined herein) to stabilize and restrict output and to fix,

raise, maintain, and/or stabilize prices for those products sold in the United States. This action

follows the filing of a Complaint by the United States Federal Trade Commission against

Defendant CSL Limited, charging that its proposed acquisition of competitor Talecris

Biotherapeutics Holdings Corporation ("Talecris") from Cerberus-Plasma Holdings, LLC

("Cerberus") would "substantially lessen competition in the markets for several life-sustaining

1

EXHIBIT C

plasma-derivative protein therapies." *See* Complaint filed by Federal Trade Commission at ¶1 (attached hereto and incorporated herein by reference thereto). Significantly, the federal government has charged that it has reason to believe that the effect of the proposed merger "will be further tightening of supply relative to demand and steeper price increases - potentially leaving critically ill patients without the treatments they need most." *Id.*

2.       As stated more fully below, Plaintiff alleges a conspiracy among Defendants and certain unnamed co-conspirators to restrict output and to fix, raise, maintain and/or stabilize prices for Plasma Derivative Products sold in, or sold for delivery in, the United States and its territories beginning in 2004 and continuing through the present. Such combination, conspiracy and agreement among Defendants violated Section 1 of the Sherman Act, 15 U.S.C.§1.

3.       As a result of Defendants' unlawful conduct, Plaintiff and the Class paid artificially inflated prices for Plasma Derivative Products and therefore have suffered injury to their businesses and property. Plaintiff and the Class seek damages and injunctive relief.

### JURISDICTION AND VENUE

4.       The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

5.       The Court also has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000 exclusive of interest and costs, and in which some members of the proposed class are citizens of a state different from some Defendants.

6.      Venue is proper in this District because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. § 1391(b) and ©, and in Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22. Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this District.

7.      The Court has personal jurisdiction over Defendants because they transact business in this District and throughout the United States, they sold Plasma Derivative Products in this District and throughout the United States, and they engaged in a fraudulent scheme and conspiracy to restrict output and fix prices that was directed at and had the intended effect of causing injury to persons and entities residing or located in, or doing business in, this District and throughout the United States.

## DEFINITIONS

8.      "Plasma Derivative Products" consist of the most prominent plasma-derivative proteins, including: (1) Ig; (2) albumin; (3) alpha-1; and (4) Rho-D.  The relevant Plasma Derivative Products for purposes of this Complaint are Ig and albumin ("Plasma Derivative Products").

9.      The manufacturing process for Plasma Derivative Products involves: (1) plasma collection; (2) plasma testing; (3) fractionation (*i.e.*, precipitation of solids by manipulation of solution pH, temperature, etc.); (4) finishing or purification; (5) quality control; and (6) lot release.  The time required to complete the full manufacturing process ranges from approximately seven months to one year.

10.      The manufacturing process is highly regulated because Plasma Derivative

3

Products run the risk of containing and transmitting infections. Regulatory bodies include the United States Food and Drug Administration ("FDA"), state regulatory agencies, and the Plasma Protein Therapeutics Association ("PPTA"), an industry self-regulatory body.

11.     Plasma Derivative Products are essential for treating a number of serious illnesses, including immune deficiency diseases, coagulation disorders, respiratory diseases, and cancer. The annual cost for such treatments can exceed $90,000 per patient in some cases.

12.     Purchasers of Plasma Derivative Products include hospitals and other health care facilities, like those that comprise the Solaris Health System. Purchasers of Plasma Derivative Products typically buy through contracts negotiated by group purchasing organizations ("GPDs") and will pay very high prices if necessary to make treatment available to critically ill patients. Consequently, small changes in production levels cause dramatic swings in prices for Plasma Derivative Products, and producers stand to increase profits greatly by controlling output relative to demand.

13.     As used herein, the term "relevant time period" means the time period between 2004 to the present.

**PARTIES**

**PLAINTIFF**

14.     Plaintiff, Solaris Health Systems, Inc. ("Solaris") is a health care network organized under the laws of the State of New Jersey, with its principal place of business located at 80 James Street, Edison, New Jersey. During the relevant time period, Plaintiff purchased Plasma Derivative Products from the Defendants. As a result of the conspiracy alleged, Plaintiff was injured in its business or property.

4

15.     Solaris is a New Jersey-based provider of a wide array of health and healthcare related services offered through an array of facilities, including an acute care hospital, inpatient and outpatient rehabilitation center, nursing and convalescent facilities, assisted living facilities and other specialized treatment programs.

16.     The Solaris organization includes the JFK Medical Center, the JFK Medical Center - Muhlenberg Campus, the JFK Johnson Rehabilitation Institute, the JFK Hartwyck Nursing, Convalescent & Rehabilitation Centers, and Whispering Knoll.

## DEFENDANTS

17.     Defendant CSL Limited is a company incorporated and domiciled in Australia, with its principal place of business located at 45 Poplar Road, Parkville, Victoria, 3052, Australia.  CSL Limited is the second-largest supplier of plasma-derivative protein therapies in the world.  It produces and sells biotherapies indicated for the treatment of several rare primary immune deficiency diseases, coagulation disorders, and inherited respiratory disease. CSL Limited is a vertically integrated company. It owns and operates one of the world's largest plasma collection networks, CSL Plasma, with collection facilities and laboratories in Boca Raton, Florida and Marburg, Germany.  It also owns and operates manufacturing sites, through its wholly owned subsidiaries, in Marburg, Germany and Bern, Switzerland. CSL Limited's worldwide sales for its 2008 fiscal year were about $2.5 billion.

18.     Defendant CSL Behring LLC is a wholly-owned U.S. subsidiary of CSL Limited and is headquartered at 1020 First Avenue, King of Prussia, Pennsylvania 19406-0901. CSL Behring is the second largest producer of plasma products in the United States.  CSL Behring's products are indicated for the treatment of coagulation disorders including hemophilia and von

Willebrand disease, primary immune deficiencies, and inherited respiratory diseases. Its products also are used in cardiac surgery, organ transplantation, burn treatment, and for the prevention of hemolytic diseases in newborns. CSL Behring has a manufacturing site in Kankakee, Illinois. CSL Behring's sales revenue was approximately $1.8 billion for its 2008 fiscal year.

19.     Defendant Baxter International Inc. is a global, diversified healthcare company that incorporated in Delaware and has its principal place of business at One Baxter Parkway, Deerfield, Illinois 60015. Baxter is the largest producer of plasma-derivative protein therapies in the world, and is the largest producer of plasma products in the United States. Baxter is divided into three business segments: Bio-Science, Medication Delivery, and Renal. The BioScience business manufactures and sells, among other products, recombinant and plasma-based proteins to treat hemophilia and other bleeding disorders, and plasma-based therapies to treat immune deficiencies, alpha 1-antritrypsin deficiency, burns and shock, and other chronic and acute blood-related conditions. Baxter maintains 15 manufacturing facilities in the United States and its territories, as well as facilities in 23 other countries. Its BioScience segment has 11 manufacturing sites domestically and abroad, including sites in Hayward, Thousand Oaks, and Los Angeles, California and in Beltsville, Maryland. In 2008, Baxter's revenues exceeded $12.3 billion, and it derives about 20% of its sales from plasma products.

## CO-CONSPIRATORS

20.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were

actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

21.     The acts alleged in this Complaint to have been done by Defendants were authorized, ordered, and condoned by their parent corporations and authorized, ordered, and performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control or transaction of their business affairs.

22.     Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. Plaintiff reserves the right to name such persons or entities in the future.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following class (the "Class"):

> All persons and/or entities in the United States who purchased Plasma Derivative Products directly from any Defendant, at any time during the period from 2004 to the present. Excluded from the Class are Defendants, their co-conspirators, all present and former parents, predecessors, subsidiaries or affiliates of Defendants, and all governmental entities.

24.     Due to the nature of the trade and commerce involved, Plaintiff believes that Class members number in the thousands throughout the country, and thus are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiff.

25.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in

violation of the antitrust laws in that they paid artificially inflated prices for Plasma Derivative Products purchased directly from Defendants or their co-conspirators.  Therefore, Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

26.     Plaintiff will fairly and adequately protect the interests of the members of the Class in that it has no interests that are antagonistic to other members of the Class and it has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Such common questions of law and fact include:

    a.     Whether Defendants and their co-conspirators engaged in a conspiracy to restrict output and to fix, raise, maintain, or stabilize the price of Plasma Derivative Products sold in the United States;

    b.     Whether Defendants' combination or conspiracy caused output to be restricted or prices for Plasma Derivative Products to be higher than they would have been in the absence of Defendants' conduct;

    c.     Whether Defendants' combination or conspiracy caused injury to the businesses or property of Plaintiff and the other members of the Class;

    d.     Whether Defendants' conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged in Count 1;

    e.     The appropriate class-wide measure of damages; and

f.    The appropriate nature of class-wide equitable relief.

28.    Plaintiff knows of no difficulty that would prevent this case from being maintained as a class action. Class action treatment is a superior method for the fair and efficient adjudication of this controversy.  Class action treatment will, among other things, allow a large number of similarly situated persons and/or entities to prosecute their common claims in a single forum, thus avoiding the unnecessary duplication of resources that numerous individual actions would require.  Moreover class action treatment allows injured persons the ability to seek redress on claims that might be impracticable to pursue individually.

29.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, which could establish incompatible standards of conduct for Defendants.

30.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. It is believed that Defendants maintain computerized information that would enable them to calculate amounts paid by the Class for Plasma-Derivative Products, aiding in the management of this litigation as a class action.

31.    Defendants have acted, and/or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

32.    In the absence of a class action, Defendants would be unjustly enriched because they would be able to retain the benefits and fruits of their wrongful conduct.

9

## INTERSTATE TRADE AND COMMERCE

### Relevant Product Markets

**Ig**

33.     Ig is a widely used drug that can be administered intravenously ("IVIG") or subcutaneously ("SCIG"). IVIG, the more predominant form, has over 20 FDA-approved indications, and as many as 150 off-label uses.  Ig products are antibody-rich plasma therapies that long have been used in the treatment of primary immune deficiencies (to provide antibodies a patient is unable to make) and certain autoimmune disorders where it is believed to act as an immune modulator.  In addition, physicians frequently prescribe Ig for a wide variety of diseases, although these uses are not described in the product's labeling and differ from those tested in clinical studies and approved by the FDA or other regulatory agencies in other countries.  These unapproved, or "off-label," uses constitute the preferred standard of care or treatment of last resort for many patients in varied circumstances.

34.     Ig represents the largest plasma-derived protein product by value. It is estimated that 70% of IVIG sold in the United States in 2007 was purchased by hospitals through contracts negotiated with GPOs.  Physician offices represented about 13% of IGIV volume, and homecare companies and specialty pharmacies represented about 17% of IGIV volume.

35.     Ig constitutes a relevant product market.

36.     There are no good substitutes for Ig.

**Albumin**

37.     Albumin is the most abundant protein in human plasma.  It is synthesized by the liver and performs multiple functions, including the transport of many small molecules in the

10

blood and the binding of toxins and heavy metals, which prevents damage that they otherwise might cause. Albumin is used to expand blood volume and to prime heart values during surgery.

38.     Albumin generally is used in surgical and trauma settings and typically is sold to hospital groups.

39.     Albumin constitutes a relevant product market.

40.     There are no good substitutes for albumin. Physicians and hospitals regard albumin as far superior from a clinical standpoint to any potential alternatives, such as hetastarch and saline products.

## Relevant Geographic Market

41.     The relevant geographic market is the United States.

42.     Like pharmaceutical products, each Plasma-Derivative Product must be approved for sale in the United States by the FDA. To obtain approval, the products must be produced from plasma collected in the United States at collection centers approved by the FDA. The products also must be manufactured at plants approved by the FDA.

43.     Performing the requisite clinical trials and undergoing the FDA approval process for plasma and plasma-derivative proteins, including Plasma-Derivative Products, takes well over two years. Accordingly, Plasma-Derivative Products sold outside of the United States are not viable competitive alternatives for United States customers, who cannot buy these products even in the event of a price increase for products available in the United States.

## Market Characteristics

44.     The structure and characteristics of the Plasma-Derivative Product markets in the United States are particularly conducive to a price-fixing agreement, and have made collusion

11

particularly attractive in this market.  These factors are discussed below.

### Commodity-Like Products

45.     A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market.  When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers both to agree on the prices for the product and to monitor these prices.

46.     Plasma-Derivative Products are homogeneous, commodity-like products within a given product category (*e.g.*, Albumin or Ig) and one Defendant's Plasma-Derivative Product easily can be substituted for a Plasma-Derivative Product made by the other Defendant.  Indeed, Talecris, a competitor of Defendants, noted in a 2008 SEC filing that "[a]mong albumin products, competition is generally based on price, given that the products tend to be homogeneous."

47.     Because Plasma-Derivative Products are commodity-like products, purchasers make purchase decisions based predominantly, if not entirely, on price.

### Lack of Substitutes

48.     The lack of available substitutes for a product also helps facilitate an effective price-fixing conspiracy.  Without substitutes, producers of the product can raise prices without losing significant sales to closely competing products.

49.     For hospitals, physicians, and others that use Plasma-Derivative Products, there simply are no suitable substitutes for these products, at any price.  They must purchase Plasma-Derivative Products regardless of the price; nothing else will do.  Indeed, as Patrick Robert of the Marketing Research Bureau Inc. has noted, "therapeutic plasma proteins [including Plasma-

Derivative Products] remain essential life-saving drugs for which there is still no competitive drug."

## Industry Concentration

50.    A high degree of concentration facilitates coordination among co-conspirators.

51.    Defendants control a high percentage of the United States plasma-derivative protein industry, collectively possessing about a 60% market share.  In particular, Baxter controls about 36% of the market, and CSL controls about 24% of the market.  The remaining manufacturers, Talecris, Grifols USA ("Grifols"), and Octapharma USA, Inc. ("Octapharma"), possess shares of approximately 23%, 7% and 5%, respectively.

52.    With respect to the domestic Ig market, according to 2008 sales volumes, Defendants collectively possess approximately a 62.9% market share.  CSL has about a 27.5% market share, and Baxter has about a 35.4% market share.  The remaining manufacturers, Talecris, Grifols, and Octapharma, possess shares of approximately 20%, 9% and 7.2%, respectively.  The market is highly concentrated, with a Herfindahl-Hirschman Index ("HHI") of 2,579.  (The HHI test is used by the FTC and DOJ to gauge market concentration.  An industry with an HHI exceeding 1,800 is deemed "highly concentrated.")

53.    With respect to the domestic albumin market, according to 2008 sales volumes, Defendants collectively possess approximately a 73.05% market share.  CSL possesses about a 36.61% market share, and Baxter maintains about a 36.44% share.  The remaining competitors, Talecris, Grifols, and Octapharma, possess shares of 8.83%, 13.06%, and 5.07% respectively.  The market is highly concentrated, with an HHI of 2,942.

54.    Throughout the Class Period, Defendants collectively possessed market power to

raise prices above competitive levels in the Plasma-Derivative Products markets in the United States without losing appreciable market share to non-co-conspirators.

**Barriers to Entry**

55.     The presence of significant entry barriers to potential competitors that could otherwise cause the incumbents to reduce their prices helps facilitate coordination among co-conspirators.

56.     The market for Plasma-Derivative Products is characterized by high entry barriers. Indeed, no firm has entered *de novo* in recent history, and prospective entrants have little chance of making a meaningful market impact in a timely fashion.

57.     Each step of the manufacturing process for Plasma-Derivative Products involves substantial up-front, sunk costs, onerous and lengthy regulatory approvals by federal and state agencies, and specialized technical know-how and expertise.

58.     Regulatory hurdles impose significant barriers to entry and extend the time it would take to enter the United States markets, let alone make a significant impact in the markets.

59.     In addition, the construction and maintenance of production facilities, including regular improvements necessitated by evolving standards of manufacturing practices, requires extensive capital expenditures and may involve long lead times to obtain the necessary governmental approval.

60.     Any new competitors in the United States also would need to secure an adequate supply of domestic plasma because only plasma collected in the United States is certified for use in products sold domestically.  Because there currently are only a very limited number of independent plasma suppliers, most of whose plasma collection and center development capacity

14

is already contracted to existing manufacturers, any new competitor likely would have to develop its own domestic-based plasma collection centers and related infrastructure.

## Demand Inelasticity

61.    Price elasticity of demand is the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.  Inelastic demand is another indicator that a price-fixing conspiracy would be successful.

62.    The demand for Plasma-Derivative Products is highly inelastic.  Plasma-Derivative Products are considered medical necessities that must be purchased by hospitals, physicians, and others at whatever the cost.  Moreover, there are no close substitutes for these products.

63.    Defendants are members of trade associations and regularly attend meetings together.

64.    For example, Defendants are members of the Plasma Protein Therapeutics Association ("PPTA").  The PPTA is "the primary advocate for the world's leading source plasma collectors and producers of plasma-based and recombinant biological therapeutics." Defendants are Global, North American, and European Members of the association, and their high-level executives, including Peter Turner, President of CSL Behring, and Larry Guiheen, President of Baxter BioScience, serve on the association's Global Board of Directors.  Mr. Turner also serves as the association's president.  The PPTA convenes its annual meeting, known as the Plasma Protein Forum, in June in the Washington, D.C. metropolitan area, and high-level

15

executives from Defendants, such as Messrs. Turner and Guiheen, routinely attend.

65.    Such trade association meetings provide the opportunity for participants in price-fixing conspiracies such as this one to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.

### Market Dynamics During Late 1990's-Early 2000's

66.    In the late 1990's, a series of events brought about by temporary plant closures, following FDA intervention, resulted in extensive change in supply for both the domestic and global plasma-derivative protein products industries.

67.    In 1997, in the wake of a recall of albumin produced by a company called Centeon, the FDA mandated the temporary closure of the plant then owned by Centeon at Kankakee, Illinois (which CSL Limited now owns). In 1999, the Alpha Therapeutic Corporation plant in Los Angeles, California (which CSL Limited also now owns) was temporarily closed. The shortages that resulted from these disruptions, particularly concerning Ig supply, caused higher prices in the United States market, spurring producers to increase plasma collections as well as output of Plasma-Derivative Products.

68.    Between 2000 and 2003, however, once the Kankakee and Los Angeles facilities had recommenced production, there was an oversupply of Plasma-Derivative Products. This led to dramatic price declines and, in turn, to a 30% reduction in gross operating margins among producers. Due to fixed costs representing a high proportion of the total costs of Plasma-Derivative Products production, this translated into a significant downturn in profits for the industry.

69.     This period of excess supply, in turn, resulted in another significant change in the industry, causing the remaining producers to reduce production and plasma collection capacity and to begin in earnest to vertically integrate.

### Industry Consolidation

70.     In 1990, there were 13 producers of plasma-derivative protein products.  In 2003, that number dropped to nine.  Since 2005, there have been only five: CSL, Baxter, Talecris, Grifols, and Octapharma.

71.     Several firms recently merged or were acquired.  The large, integrated suppliers, most notably Defendants, have acquired numerous independent plasma collectors and facilities, and continue to do so.  And soon after acquiring them, Defendants shut down many of them.

72.     CSL Limited acquired the Swiss Red Cross fractionator, ZLB, as well as 47 plasma collection centers from Nabi, in July 2000.  It acquired Aventis Behring's plasma products business in 2003.  CSL Limited subsequently closed 35 plasma collection centers in the United States, reduced plasma collections by 1 million liters, and reduced plant output by 1.1 million liters.

73.     Baxter acquired 42 plasma collection centers and a laboratory from Alpha Therapeutic Corporation (Mitsubishi Pharma) in late 2002.  Baxter subsequently closed 26 of its own plasma collection centers and 38 collection centers that it acquired from Alpha Therapeutic, as well as a plant in Rochester, Michigan.

74.     As one investment firm with knowledge of the industry has noted, "[a]bout 80% of the [plasma collection] centers are now owned by plasma-products companies such as Baxter International, CSL Limited, Grifols, and Talecris Biotherapeutics.  This represents a complete

17

reversal in ownership since 2000, when 80% of the centers were independent enterprises."

75.     In 2005, a major non-profit entity, the American Red Cross, exited the plasma products industry.

76.     The plasma products industry as it now exists has significantly fewer suppliers than it did even six years ago.  The remaining suppliers, most notably among them Defendants, are larger and more vertically integrated than even before.

## THE CONSPIRACY

77.     As consolidation has occurred in the plasma-derivative protein products industry, supply has been limited in the face of increasing demand, and prices consequently have increased in recent years.  GPOs, hospitals, physicians – and ultimately patients – have experienced tightening supplies and rising prices. The restriction of supply and increase in prices for Plasma-Derivative Products began by at least 2005 and has continued through the present.

78.     The restriction of supply and increase in prices was not the result of natural market forces. Rather, they were caused by Defendants' conspiracy, which Defendants formed in response to the excess supply that occurred earlier in the decade and that Defendants did not want to experience again.

79.     Indeed, Baxter explained in a recent investor call how competitors have *"lived through the events of the early 2000's,"* referring to the period of excess supply and lower prices, and now have returned to a time of "very good stock prices and very good returns for shareholders."  Similarly, at the 2007 Plasma Protein Forum, held June 5-6 at the Hyatt Regency in Reston, Virginia and attended by numerous industry executives, including those of Defendants, Peter Turner, PPTA Chairman and President of CSL Behring, "declared *the industry*

18

*to be in 'good shape' after a few bumps in the road in years past.*"

80.     Defendants implemented their illegal agreement by coordinating and restricting output and by signaling to one another and to other competitors to do the same. Indeed, during and after the period of excess capacity earlier in the decade, Defendants recognized that controlling capacity was critical to preventing price competition.

81.     A key element of the conspiracy was Defendants' focus on the prevention of oversupply of Plasma-Derivative Products and plasma in the marketplace.  For example, Baxter has recognized that as long as competitors are not "*irrational*" and do not *trash price and take share*," then they can increase supply steadily in line with market demand to keep prices high.

82.     Competitive information is widely available from industry sources and the competitors themselves. Firms closely monitor each others' activities with respect to plasma collection, manufacturing, and output, and firms collect and catalogue an extraordinary wealth of timely competitive information.

83.     Defendants have taken advantage of this timely competitive information not only by monitoring their competitors' activities, but also by engaging in signaling – *i.e.*, the intentional sharing of competitive information for purposes of seeking to ensure that manufacturers all are restraining output, curbing growth, and maintaining high prices.

84.     In particular, Defendants have used specific key words to: (1) suggest to each other that increasing the production of Plasma-Derivative Products could hurt the firms' ability to reap significant profits that they all gained during an extended period where demand exceeded supply for these products; (2) remind each other of how, during a period when supply increased, prices and profitability for firms dropped substantially; and (3) encourage one another to increase

19

supply only incrementally to keep pace with demand, and not increase supply to the extent the firms actually compete with one another for market share.

85.     Baxter's CFO acknowledged Defendants' signaling in a recent investor call: "Why any of us would, for a very short-term gain, do anything to change [the current marketplace dynamic], I just don't see why we would.  It wouldn't make any sense and *from everything we read and all the signals we get, there is nothing that says anyone would do that.  I think people are very consistent in the messages they deliver, which are pretty consistent with what we have told you today."*

86.     Another aspect of the conspiracy was the rationing of supply to purchasers.  In 2006, the Department of Health and Human Services ("HHS") investigated reports that patients were experiencing problems purchasing Ig.  HHS States that Ig "*[m]anufacturers are currently allocating IGIV to their customers.  Under this allocation system, most customers are expected to justify their current IGIV use to the manufacturer to maintain and/or increase their allocations.  In economic terms, current IGIV supplies are being rationed.*"  HHS also noted that "[t]he existence of the secondary market with high IGIV prices combined with a manufacturer instituted allocation system for IGIV are symptomatic of a market in which demand exceeds supply."  HHS concluded that a majority of hospitals surveyed could not purchase enough IGIV to meet all of their patient needs, and calculated that the shortfall of supply relative to demand was approximately 14%.

87.     Defendants have explored means of punishing firms, most notably Talecris, that have attempted to buck the prevailing restrained industry approach by increasing output.

88.     Talecris is the one firm in the industry that potentially could thwart the prevailing

20

restrained approach that Defendants successfully have advocated and implemented thus far. Indeed, according to the FTC, Talecris is "the one firm that has consistently and significantly expanded output in the United States." Moreover, Talecris recently stated in a 2008 SEC filing that it "intend[s] to serve the overall market growth with incremental increases in production capacity" in 2008 and 2009.

89.     In a further attempt to reduce industry production capacity and maintain high prices and margins, CSL Limited recently attempted to acquire Talecris. In an unusual move for a company whose competitor was contemplating a key acquisition, Baxter publicly expressed its view that CSL Limited's attempted acquisition of Talecris would be "*a positive stabilizing move within the industry.*" The FTC subsequently sought to block the attempted acquisition. (The FTC action is discuss in depth below and the FTC Complaint is attached hereto and incorporated herein by reference thereto.)

90.     Defendants' agreement to restrict supply and raise prices has been assisted by increased industry consolidation and the resulting oligopolistic market structure. The remaining participants have recognized that they are operating in an oligopoly where they are better off avoiding competition, restricting supply, and raising prices.

91.     The average sales price for a gram of IVIG has increased from about $47.60 in 2005 to about $57 in 2009, according to an analyst presentation that Grifols gave on March 5, 2008. The same presentation stated that "IVIG, which remains the driver of the plasma derivatives market, has witnessed price increases since 2005, coinciding with increased demand related to product availability."

92.     The average sales price for a gram of albumin has increased from about $1.25 in

2005 to about $2.20, according to the same Grifols presentation. The presentation also reports that "average albumin prices have steadily increased since 2005 from U.S. $14 to around U.S. $35 per 12.5 g. via at present." A Talecris 2008 SEC filing similarly notes that "[p]rices for albumin have increased significantly since 2005....The average selling price in 2007 was $28.55, having grown at a CAGR of 35% since 2005, when the U.S. average selling price (ASP) was $15.58."

93.     Defendants contemporaneous business reports have borne out these facts. For example, CSL Limited reported in its October 2004 Annual General Meeting presentation: "IVIG - prices have been stable with upward pressure going forward; currently experiencing solid demand;" and "Albumin - prices stable after period of weakness; inventory oversupply reducing." In its October 2005 Annual General Meeting presentation, CSL Limited remarked that "US IVIG pricing environment improving," and that with respect to the CSL Behring, it is "managing plasma throughput to match: run down in inventory benefit; reduction of inventory levels'; [and] demand." The Chairman's Address from the same 2005 meeting stated that CSL "Behring is well positioned to develop its global business through," among other things, "an effective balance between supply and demand." And in its October 2006 Annual General Meeting presentation, CSL Limited noted both that the "strong global demand for plasma therapies continues," and "plasma sector stability."

94.     Defendants' conspiracy has resulted not only in supra-competitive pricing, but also extraordinary profits for Defendants, even as most other industries have experienced drastically lowered earnings in the face of the global economic crisis.

95.     According to a March 2009 report issued by CSL's chairman, CSL experienced a

22

post-tax net profit of $502 million for the half-year ended December 31, 2008, an increase of 44% from the same period last year. The report also notes that "[t]he global financial crisis has had little to no impact so far on sales of CSL's portfolio of life-saving therapies and essential vaccines....[a]nd we anticipate broadly stable market conditions to continue."

96.     CSL Behring sales revenue increased 33% to $1.8 billion compared with the same period the previous year, "with strong contributions from both core and specialty plasma products," according to the same March 2009 CSL report.

97.     Revenues from Baxter's BioScience unit climbed 12% to $1.36 billion in 2008, largely pursuant to sales of plasma-based hemophilia and immune disorder treatments, vaccines and biosurgery products. Due to the profit its BioScience unit has generated, one news article has noted that "Baxter is one of a handful of stocks that have proven somewhat resistance to the local recession."

## FTC INVESTIGATION

98.     On March 27, 2009, the FTC authorized a lawsuit to block CSL Limited's proposed $3.1 billion acquisition of Talecris, charging that the deal would be illegal and substantially would reduce competition in the United States markets for Ig, albumin, Rho-D, and Alpha-1. On the same date, the FTC also sought a preliminary injunction in federal district court in the District of Columbia to stop the transaction pending completion of an administrative trial.

99.     In an FTC press release accompanying the filing of the lawsuit, Richard Feinstein, Director of the FTC's Bureau of Competition, stated that "[s]ubstantial consolidation has already occurred in the plasma protein industry, and *these highly concentrated markets are already exhibiting troubling signs of coordinated behavior.*"

100.   The FTC described in its Complaint, among other things, *"troubling signs of coordinated behavior,"* including Defendants' signaling, product rationing, and other public statements and actions indicative of anti-competitive conduct.

101.   The FTC alleged that, "with the elimination of Talecris - the one firm that has consistently and significantly expanded output in the United States - *CSL and Baxter International, Inc. ("Baxter") would face no remaining significant obstacle in their efforts to coordinate the tighten supply conditions* for the relevant products, to the great detriment of consumers."

102.   Notably, numerous sentences and parts of sentences from the FTC complaint have been redacted from public viewing. The FTC has moved to file an unredacted version of the complaint.

103.   The FTC has stated that the redacted "language suggests a *strong possibility of ongoing coordinated interaction between firms in the plasma industry.* Evidence of transparency, interdependence, and signaling among firms is particularly relevant to the allegations in this matter. The language at issue bears on these very important points, and demonstrates how firms used specific key words to:

- suggest to each other that increasing the production of lifesaving drugs could hurt the firms' ability to reap the significant profits they all achieved during an extended period where demand exceeded supply for the key products;

- remind each other of how, during a period when supply increased, prices and profitability for the firms in the market dropped significantly; and

- encourage each other to only increase supply incrementally to keep pace with demand, not increase supply to the extent the firms actually compete with each other for market share."

24

104.    The FTC also has noted that the redacted "*quoted language. . . .is similar to language that in other instances has been found to be evidence supporting an illegal price fixing conspiracy. See, e.g., In re High Fructose Corn Syrup Antitrust Litigation,* 295 F.3d 651, 662 (7th Cir. 2002) (Posner, J.) (Referring to competitor as a 'friendly competitor,' mentioning an 'understanding between the companies that. . .causes [them] not to . . .make irrational decision,' and querying whether competitors 'will play by the rules (discipline)' can all be evidence of an explicit agreement to fix prices)."

105.    CSL Limited has opposed the FTC's motion to file an unredacted version of the complaint, claiming that every quote in the complaint derived from the respondents' documents constitutes confidential business information, and that disclosure of this information irreparably would harm their reputations.  The FTC has responded by stating that the redacted material does not qualify as confidential business information, and that while disclosure of the material would cause "*embarrassment*" and "*could 'expose respondent to possible treble damages.'*" Those reasons are not sufficient to prevent disclosure.

106.    Shortly after the filing of the FTC complaint, on June 8, 2009, CSL Limited and Talecris publicly announced that they would abandon the proposed merger.  On June 15, 2009, the FTC and the two firms jointly filed a motion to dismiss the FTC's complaint on that basis, and on June 22, 2009, the FTC dismissed the complaint.

107.    There has been no ruling yet on the FTC's motion to file an unredacted version of the complaint.  Significantly, the FTC has not abandoned its position, believing that the public interest would best be served by full disclosure of the redacted language.

25

## ANTITRUST VIOLATIONS

108.   Beginning at least as early as 2004, and continuing through the present, Defendants and their co-conspirators engaged in a continuing agreement, understanding, and conspiracy in restrained of trade to restrict output and to artificially raise, fix, maintain or stabilize the prices of Plasma-Derivative Products in the United States.

109.   Based on the foregoing, and on information and belief, in formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to restrict output and to artificially raise, fix, maintain, or stabilize the price of Plasma-Derivative Products sold in the U.S. These activities include:

(a)     Defendants participating in conversations or communications to discuss the supply and price of Plasma-Derivative Products in the United States;

(b)     Defendants agreeing during those conversations or communications to restrict output and to charge prices at specific levels and otherwise to increase or maintain prices of Plasma-Derivative Products sold in the United States; and

©     Defendants agreeing during those conversations or communications to restrict output and to fix or stabilize prices of Plasma-Derivative Products sold in the United States; and

110.   Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in the Complaint.

111.   Throughout the Class Period, Plaintiff and the other Class members purchased Plasma-Derivative Products from Defendants (or their subsidiaries or controlled affiliates) or

26

their co-conspirators at supra-competitive prices.

112.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

## EFFECTS OF THE CONSPIRACY

113.    As a result of Defendants' unlawful conduct, Plaintiff and the other Class members have been injured in their businesses and property because they have paid more for Plasma-Derivative Products than they would have paid in a competitive market.

114.    The unlawful contract, combination or conspiracy has had at least the following effects:

   a.    price competition in the markets for Plasma-Derivative Products has been artificially restrained;

   b.    prices for Plasma-Derivative Products sold by Defendants have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

   c.    purchasers of Plasma-Derivative Products from Defendants have been deprived of the benefit of free and open competition in the Plasma-Derivative Product markets.

## FRAUDULENT CONCEALMENT

115.    Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until May 27, 2009, when the FTC's redacted Complaint was filed.

116.    Because Defendants' alleged conspiracy was kept secret until May 27, 2009, Plaintiff and members of the Class before that time were unaware of Defendants' unlawful

conduct alleged herein, and they did not know before that time that they were paying supra-competitive prices for Plasma-Derivative Products throughout the United States during the Class Period.

117.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

118.    By their very nature, Defendants' conspiracy was inherently self-concealing. Plasma-Derivative Products are not exempt from antitrust regulation, and thus, before May 27, 2009, Plaintiff reasonably considered it to be a well-regulated, competitive industry.

119.    In the context of the circumstances surrounding Defendants' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' pricing was conspiratorial.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' preferred Plasma-Derivative Products prices before May 27, 2009.

120.    Plaintiff and members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and fraudulently conceal their conspiracy.

121.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until May 27, 2009, when

28

the FTC Complaint, and its corresponding factual allegations of anti-competitive conduct concerning Plasma-Derivative Products, was first publicly disseminated.

122.    None of the facts or information available to Plaintiff and members of the Class prior to May 27, 2009, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to that date.

123.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and members of the Class have alleged in this Complaint.

124.    Defendants and their co-conspirators engaged in a successful anti-competitive conspiracy concerning Plasma-Derivative Products, which they affirmatively concealed, at least in the following respects:

        a.      By communicating secretly to discuss outpatient and prices of Plasma-Derivative Products in the United States; and

        b.      By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme.

125.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Plaintiff's and the Class' claims have been tolled.

## VIOLATIONS ALLEGED

### Violation of Section 1 of the Sherman Antitrust Act and Section 16 of the Clayton Act

126.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

29

127.   Beginning at a date unknown to Plaintiff, but no later than 2004, and continuing through to the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize the prices for Plasma Derivative Products paid by Plaintiff and the other Class members in violation of Section 1 of the Sherman Act, 15 U.S.C.§ 1. Such a contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

128.   As a result of their unlawful actions, Defendants were able to force coordinated price increases on the United States Plasma-Derivative Product markets.

129.   Defendants' unlawful conduct took many forms, including but not limited to:

a.     Attending meetings and/or otherwise exchanging information regarding the pricing and sale of Plasma Derivative Products.

b.     Agreeing to sell Plasma Derivative Products at specific, pre-arranged prices;

c.     Agreeing not to compete for each other's customers;

d.     Announcing price increases for Plasma Derivative Products at or near the same times;

e.     Implementing price increases for Plasma Derivative Products in the same or similar amounts and at or near the same times;

f.     Selling Plasma Derivative Products to customers at collusive and non-competitive prices;

g.     Giving actual and/or apparent authority to employees' participation in

30

furtherance of the wrongful conduct; and

h.      Fraudulently concealing the wrongful conduct.

130.    Defendants' wrongful conduct in manipulating prices was undertaken in order to charge artificially inflated prices for their Plasma Derivative Products.

131.    As a direct result of the unlawful conduct of Defendants and their co-conspirators in furtherance of their continuing contract, combination, or conspiracy, Plaintiff and other members of the Class have been injured in their businesses or property in that they have paid more for Plasma Derivative Products than they would have paid in the absence of Defendants' and their co-conspirators' price fixing.

132.    These violations are continuing and will continue unless enjoined by this Court.

133.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## DAMAGES

134.    During the Class Period, Plaintiff and the other members of the class purchased Plasma Derivative Products, and by reason of the anti-competitive conduct herein alleged, paid more for such products than they would have paid in the absence of such antitrust violations.  As a result, Plaintiff and the other members of the Class have sustained damages in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

135.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A.     That the Court determine that the claims alleged herein under the Sherman Act may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.     That the Court adjudge and decree that the unlawful conduct, contract, combination and conspiracy alleged herein constitutes:

I.     violation of the Sherman Act, 15 U.S.C. §§ 1, as alleged herein;

C.     That Defendants, their co-conspirators, successors, transferees, assigns, parents, subsidiaries, affiliates, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on behalf of Defendants, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining, or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting or following any practice, plan, program, or design having a similar purpose or effect in restraining competition;

D.     That Plaintiff and Class members be awarded pre-judgment and post-judgment interest as permitted by law;

E.     That Plaintiff and Class members recover their costs of suit, including reasonable attorneys' fees as provided by law; and

F.     That Plaintiff and Class members be awarded such other and further relief as may be necessary and appropriate.

32

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Constitution of the United States, Plaintiff demands a trial by jury of all issues so triable.

Date: July 24, 2009

Respectively submitted,

*Donald Haviland*

Donald E. Haviland, Jr., Esquire
Robert G. Hughes, Esquire
Michael J. Lorusso, Esquire
**THE HAVILAND LAW FIRM, LLC**
111 S. Independence Mall East, Suite 1000
Philadelphia, PA 19106
Telephone: 215-609-4661
Facsimile: 215-392-4400
Haviland@havilandlaw.com
Hughes@havilandlaw.com
Lorusso@havilandlaw.com

Barry R. Eichen, Esquire*
William O. Crutchlow, Esquire*
Christian R. Mastondrea, Esquire*
**EICHEN, LEVINSON & CRUTCHLOW**
40 Ethel Road
Edison, NJ 08817
Telephone: 732-777-0100
Facsimile:  732-248-8273
Beichen@eichenlevinson.com
Wcrutchlow@eichenlevinson.com
Cmastondrea@eichenlevinson.com
(*pro hac vice applications pending)

Counsel for Solaris Health Systems, Inc.
And the Class

33

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| HOSPITAL DAMAS, INC., on behalf of itself and all others similarly situated, | ) ) ) | No. _____ |
| Plaintiff, | ) ) | **CLASS ACTION COMPLAINT** |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| CSL LIMITED, CSL BEHRING LLC and BAXTER INTERNATIONAL INC., | ) ) ) | |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Hospital Damas, Inc. ("Plaintiff"), on behalf of itself and all others similarly

situated, brings this action for treble damages, injunctive relief and costs of suit under the

antitrust laws of the United States against CSL Limited, CSL Behring LLC, and Baxter

International Inc. ("Defendants"). Plaintiff alleges the following on information and belief

which is based on, *inter alia*, the investigations conducted by its attorneys.

## NATURE OF CLAIM

1.     Plasma is the watery liquid in which blood cells are suspended. It is derived from

humans during blood and/or plasma donations, including paid donations. The type of blood

plasma obtained as a byproduct of whole blood collected during blood donations is typically

referred to as "recovered plasma" and comes from unpaid volunteers. Plasma collected from

plasma donations is commonly referred to as "source plasma" and comes from paid donors.

2.     Plasma-Derivative Protein Therapies are plasma-based products used to treat

patients suffering from serious illnesses such as bleeding disorders and immune deficiencies.

**EXHIBIT D**

The Plasma-Derivative Protein Therapies involved in the unlawful conduct alleged herein are

Immune globulin ("Ig", "IGIV" or "IVIG") and Albumin.

3.      Blood plasma therapies are unique among pharmaceuticals and biologics because

their production begins with a biological starting material – human plasma – instead of a

chemical or synthetic, which is the starting material for a majority of pharmaceuticals.  Human

plasma is abundant in a number of proteins, including albumin, clotting factors, immunoglobins

and alpha-1 proteinase inhibitors. These proteins are utilized to make therapies that treat "rare,

chronic, often genetic diseases such as hemophilia, primary immunodeficiencies and alpha-1

antitrypsin deficiency, and acute conditions such as burns and shock."  Further, such products

"are being tested for efficacy in the case of Alzheimer's disease."

4.      The ability to produce high-quality blood plasma-derived therapies that are safe

for consumers depends in part on the willingness of people to donate plasma, including by paid

donations.  The process of donating blood plasma is a long and tedious one. The first donation

can take up to three hours of a donor's time, and involves a series of screenings, donor education,

and the actual donation process itself.  After the first donation, subsequent donations can take up

to two hours. It is mandatory that the first two donations test negative for transmissible diseases

before the first donation can be used.

5.      The plasma donation process is uncomfortable.  Stuart Bauer, a writer for *New

York* magazine described his donation experience as follows:

> The pain of insertion comes in three overlapping waves. The first two waves--the
> puncturing of the skin and the piercing of the radial vein--are dicey enough, but
> stubbing a toe or biting the tongue are really worse. It is the third wave, the least
> painful part, that carries the freight. For when the body of the catheter is fitted
> inside the vein, distending it, it catches you--of all places--in the heart, which
> registers the intrusion with a *chilly ping*. When the next beat comes the heart's
> resumption has a choked rhythm . . . and you resolve from here on in to cater to
> your heart. But the only favor it occurs to you you can do is not to breathe too

deeply. So you take in air in miserly little sniffs. And root for your heart as you would for a long-distance runner who had stumbled. . . .

6.      Nonetheless, paid donors wait in line to donate plasma in order to earn between $20-$40 per donation.

7.      The production of blood plasma-derived therapies is done through a process called "fractionation." The process is unique to plasma-derived therapies.  In this process, the plasma is "pooled, purified, and processed to extract specific plasma proteins that have a proven health benefit."  Therapeutic proteins are then extracted from a plasma production pool of multiple donations in a specific order.  These proteins are separated using a "linked series of steps with varying conditions of temperature, pH, ethanol concentration," among others. The number of proteins that are extracted from this pool is known as the "yield."  Due to the complexity of the fractionation process, the time between donation and final product release can take anywhere between seven and nine months.

### The Product Industry

8.      The blood plasma-derived product industry is valued at $14 billion globally. The U.S. accounts for approximately 70 percent of the world's supply of plasma.

9.      In terms of demand, North America accounts for 40 percent of the product market, with Europe constituting 32 percent and Asia 19 percent.  The United States, due to its permissive rules regarding collection and the close association of its plasma firms has been dubbed the "OPEC of plasma."

10.     In 2006, the U.S. Bureau of Labor Statistics decided to add human blood plasma services to its Producer Price Index. A Producer Price Index is a measure of the average change over a given period of time in the selling prices received by domestic producers for their output. Prices for these services have risen steadily from June 2006 to April 2009, as shown in Figure 1.

This 2006-2009 time period constitutes a large portion of the proposed class period in this matter.

**Figure 1**
**Producer Price Index: Human Blood Plasma Services**



Source: U.S. Bureau of Labor Statistics

11.    The value of plasma is apparent.  According to a June 8, 2009 article in *Fortune* magazine, a pint of plasma has an exchange price of $20 a pint versus 18¢ a pint for oil.

12.    Every year, tens of thousands of people in the United States require Plasma-Derivative Protein Therapies to treat serious and life-threatening illnesses including clotting disorders, liver disease and hemophilia.

13.    The annual cost for Plasma-Derivative Protein Therapies can exceed $90,000 per patient in some cases.

14.    Plasma-Derivative Protein Therapies sold in the U.S. must be made from plasma collected in the United States.  Defendants are the primary developers, manufacturers and sellers of Plasma-Derivative Protein Therapies in the United States.  Defendants manufacture and sell nearly all of the Plasma-Derivative Protein Therapies sold in the United States.

15.    Collectively, Defendants sell billions of dollars worth of Plasma-Derivative Protein Therapies every year in the United States.

16.    During the Class Period (defined below), Defendants engaged in a conspiracy to artificially fix, raise, maintain or stabilize the prices of Plasma-Derivative Protein Therapies in the United States by agreeing to restrict the output of Plasma-Derivative Protein Therapies.  As a result of this illegal conspiracy, Defendants were able to charge supra-competitive prices for Plasma-Derivative Protein Therapies sold in the United States, thereby injuring Plaintiff and members of the Class.

## JURISDICTION AND VENUE

17.    This action arises under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 1, 15 and 26).

18.    This Court has jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337.

19.    Venue is proper in this District pursuant to sections 4 and 12 of the Clayton Act, §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c) and(d).  Defendants are found and transact business in the District and/or the claims arose at least in part in the District.  Defendants regularly and continuously conduct business in interstate and foreign commerce between and among the United States and foreign countries.  The interstate trade and commerce relevant to this action has been carried out, in part, within the District.

## PARTIES

20.    Plaintiff Hospital Damas, Inc. is a non-profit organization with its principal place of business at 2213 Ponce By Pass, Ponce, Puerto Rico 00717-1318.  During the Class Period, Plaintiff purchased Plasma-Derivative Protein Therapies immune globin and albumin in the

United States directly from one or more of the Defendants and was injured as a result of Defendants' unlawful conduct.

21.     Defendant CSL Limited is an Australian corporation with its principal place of business at 45 Poplar Road, Parkville, Victoria, 3052, Australia. CSL Limited is the second largest supplier of Plasma-Derivative Protein Therapies in the world, with 2008 worldwide sales of approximately $2.5 billion, 37% of which came from North America, including the United States. It is a vertically-integrated company, with plasma collection facilities in addition to drug manufacturing facilities.

22.     CSL Limited is the only supplier of blood plasma in Australia and maintains a monopoly contract with the government for blood plasma supply in that country. CSL's CEO, Brian McNamee has said regarding the contract: "Actually, the whole strategy is to keep hidden, to some degree, that we provide a service for the government (and) the Australian Red Cross, because there is a concern that the voluntary donor system would be troubled if a greedy commercial fractionator was seen to be profiting from their donations."

23.     CSL Behring LLC is CSL Limited's wholly-owned subsidiary headquartered at 1020 First Avenue, King of Prussia, Pennsylvania, 19406. CSL Behring owns and operates more than 70 plasma collection facilities in the United States and Germany, and three plasma manufacturing centers, including one in Illinois.

24.     Defendants CSL Limited and CSL Behring are collectively referred to herein as "CSL."

25.     Defendant Baxter International Inc. ("Baxter") is a Delaware corporation headquartered at One Baxter Parkway, Deerfield, Illinois, 60015. Baxter is the leading

6

manufacturer of Plasma-Derivative Protein Therapies, with 2008 revenues of $12.3 billion, more

than 33% of which comprised its plasma-based business segment.

## CO-CONSPIRATORS

26.     Various other companies and individuals not named as Defendants in this

Complaint participated as co-conspirators in the acts complained of, and performed acts and

made statements in furtherance of the unlawful conduct.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action under Rules 23(a), (b)(2) and 23(b)(3)

of the Federal Rules of Civil Procedure, on behalf of itself and others similarly situated.  The

"Class" is defined as:

> All persons or entities who purchased Plasma-Derivative Protein Therapies
> immune globin or albumin directly from one or more of the Defendants or their
> co-conspirators in the United States (the "Class"), at any time from at least
> January 1, 2004 through the present (the "Class Period").  Excluded from the
> Class are Defendants, subsidiaries or affiliates of Defendants, Defendants' co-
> conspirators, whether or not named as a Defendant in this Complaint, and
> government entities.

28.     The Class is so numerous that joinder of all members is impracticable.  Due to the

nature of the trade or the commerce involved, Plaintiff believes that the members of the Class are

geographically dispersed throughout the United States, and that joinder of all Class members

would be impracticable.  While the exact number of Class members is unknown to Plaintiff at

this time, Plaintiff believes that there are at least hundreds of members of the Class and that their

identities can be learned from Defendants' and their co-conspirators' books and records.

29.     Plaintiff's claims are typical of the claims of the other members of the Class.

Plaintiff and members of the Class purchased Plasma-Derivative Protein Therapies during the

Class Period at artificially maintained, non-competitive prices, resulting from the unlawful

actions of Defendants and their co-conspirators.  Plaintiff and members of the Class have

sustained damage in that they paid inflated prices for Plasma-Derivative Protein Therapies during the Class Period due to Defendants' conduct in violation of federal law as set forth below.

30.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and antitrust litigation.

31.     Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     Whether Defendants conspired with each other and their co-conspirators to raise, fix, maintain or stabilize the price of Plasma-Derivative Protein Therapies in the United States by restricting or controlling output of Plasma-Derivative Protein Therapies;

b.     Whether Defendants undertook actions to conceal their unlawful conspiracy; and

c.     Whether Defendants' conduct violated the relevant federal antitrust laws and caused injury to the business and property of Plaintiff and the members of the Class and, if so, the proper measure of damages.

32.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

8

33.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

34.     Throughout the Class Period, there has been a continuous and uninterrupted flow of transactions in and shipments of Plasma-Derivative Protein Therapies in interstate commerce throughout the United States.

35.     The unlawful activities of Defendants and their co-conspirators have been within the flow of, and have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## THE PLASMA-DERIVATIVE PROTEIN THERAPIES MARKET

36.     Defendants are manufacturers of Ig and Albumin, which are plasma-based therapies used to treat patients suffering from numerous bleeding disorders, immune deficiencies and other serious diseases.

37.     Ig is a widely used drug that can be administered intravenously ("IVIG" or "IGIV") or subcutaneously ("SCIG"). IVIG, the more predominant form, has over 20 FDA-approved indications, and as many as 150 off-label uses. The most common uses involve the treatment of Primary Immunodeficiency Diseases and neurological conditions – *e.g.*, Guillain-Barre Syndrome and chronic inflammatory demyelinating polyneuropathy.

38.     Albumin is used as a blood volume expander, to prime heart valves during surgery, and to treat liver disease.

39.     The U.S. market for plasma-derived products in 2007 was approximately $3.5 billion.

40.     The manufacturing process for producing Plasma-Derivative Protein Therapies ranges from seven months to one year.  It involves: (1) plasma collection; (2) plasma testing; (3) fractionation (*i.e.*, precipitation of solids by manipulation of solution pH, temperature, etc.); (4) finishing or purification; (5) quality control; and (6) lot release.

41.     The manufacturing process is highly regulated because plasma products run the risk of containing and transmitting infections.  Regulators include the U.S. Food and Drug Administration ("FDA"), state regulatory agencies and the Plasma Protein Therapeutics Association ("PPTA"), an industry self-regulatory body.

42.     The FDA must approve plasma collection centers and the plants at which Plasma-Derivative Protein Therapies are made, as well as the therapies themselves.

43.     Plasma is a very expensive raw material, representing between 40 to 70% of the cost of Plasma-Derivative Protein Therapies.

44.     As further set forth below, the market has substantially consolidated over the past two decades.  In 1990, there were thirteen Plasma-Derivative Protein Therapy manufacturers.  In 2003, the number of Plasma-Derivative Protein Therapy manufacturers was reduced to nine. Today there are only five: CSL, Baxter, Talecris and two small manufactures Grifols and Octapharma.

45.     The Federal Trade Commission ("FTC") has determined that the Plasma-Derivative Protein Therapies market operates as a "tight oligopoly."

46.     The U.S. Department of Health and Human Services ("HHS") issued a report on the IGIV market in February 2007 entitled *Analysis of Supply, Distribution, Demand, and Access*

*Issues Associated with Immune Globulin Intravenous (IGIV)* ("HHS Report").  One of its key findings was that Ig "manufacturing is a tight oligopoly in which the leading three manufacturers [CSL, Baxter and Talecris] . . . have a combined market share of around 85%."

47.     During the Class Period, demand for Plasma-Derivative Protein Therapies has exceeded supply.

48.     According to the HHS Report, demand for IGIV has risen sharply over the last decade.  The HHS Report found that "[t]he existence of a secondary market with high IGIV prices combined with a manufacturer instituted allocation system for IGIV are symptomatic of a market in which demand exceeds supply."

49.     Purchasers of Plasma-Derivative Protein Therapies will pay high prices if necessary to make treatment available to critically ill patients.  As a result, small changes in production levels cause dramatic swings in prices for products, and producers stand to increase profits greatly by controlling output relative to demand.

50.     Control of supply is critical to preventing price competition.  Limiting the supply of Plasma-Derivative Protein Therapies serves to raise prices.

51.     Likewise, a high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among possible co-conspirators and it makes it more difficult for customers to avoid the effects of the collusive behavior.

52.     Prices for Plasma-Derivative Protein Therapies have increased during the class period, including as shown *supra* in Figure 1.

### Geographic Market

53.     The relevant geographic market is the United States.

11

54.     Like pharmaceutical products, each Plasma-Derivative Protein Therapy produced must be approved for sale in the United States by the FDA.  To obtain approval, the products must be produced from plasma collected in the United States at collection centers approved by the FDA.  The products also must be manufactured at plants approved by the FDA.

55.     Performing the requisite clinical trials and undergoing the FDA approval process for plasma and plasma-derivative proteins, including Plasma-Derivative Protein Therapies, takes well over two years.  Accordingly, Plasma-Derivative Protein Therapies sold outside of the United States are not viable competitive alternatives for United States customers, who cannot buy these products even in the event of a price increase available in the United States.

## GOVERNMENT ANTITRUST INVESTIGATION

56.     The FTC recently investigated the Plasma-Derivative Protein Therapies market and uncovered evidence suggesting the existence of an illegal price-fixing conspiracy.

57.     The circumstances surrounding the FTC's investigation involved a potential acquisition by CSL of Talecris.  Pursuant to an Agreement and Plan of Merger, dated August 12, 2008 ("Agreement"), CSL proposed to acquire all of the outstanding voting securities of Talecris in a transaction valued at $3.1 billion.

58.     The proposed acquisition was reviewed for potential anticompetitive effects by the FTC.

59.     After an extensive eight month investigation, which included the collection of testimony and declarations from 21 witnesses, on May 27, 2009, the FTC filed an administrative complaint ("Complaint") to block the proposed acquisition because it would violate Section 5 of the Federal Trade Commission Act, as amended, 1 U.S.C. § 45, by (1) making CSL the world's largest maker of blood plasma products; (2) substantially reducing competition in the U.S. market for Plasma-Derivative Protein Therapies, among other plasma-based products; (3)

limiting industry supply of Plasma-Derivative Protein Therapies, among other plasma-based products; and (4) causing increased prices for Plasma-Derivative Protein Therapies, among other plasma-based products.

60.     As a result of its investigation, and as described more fully herein, the FTC found that Defendants controlled capacity and engaged in signaling – *i.e.*, the intentional sharing of competitive information for purposes of securing accommodating responses from competitors.

61.     Baxter publicly supported the consolidation of its two competitors, stating that the CSL-Talecris acquisition would be "a positive stabilizing move within the industry."

62.     The FTC's complaint was heavily redacted at the demand of CSL and Talecris. In a motion to place the unredacted complaint on the public record, the FTC stated that the redacted "language suggests a strong possibility of ongoing coordinated interaction between firms in the plasma industry. Evidence of transparency, interdependence, and signaling among firms is particularly relevant to the allegations in this matter.  The language at issue bears on these very important points, and demonstrates how firms used specific key words to:

- suggest to each other that increasing the production of lifesaving drugs could hurt the firms' ability to reap the significant profits they all achieved during an extended period where demand exceeded supply for the key products;

- remind each other of how, during a period when supply increased, prices and profitability for the firms in the market dropped significantly; and

- encourage each other to only increase supply incrementally to keep pace with demand, not increase supply to the extent the firms actually compete with each other for market share."

63.     In the motion, the FTC also stated that the redacted language "is similar to language that in other instances has been found to be evidence supporting an illegal price fixing conspiracy," and relied on *In Re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 662 (7th Cir. 2002) (Posner, J.) (referring to competitor as a "friendly competitor," mentioning

an "understanding between the companies that ... causes [them] not to ... make irrational decisions," and querying whether competitors will "play by the rules (discipline)" can all be evidence of an explicit agreement to fix prices).

64.     CSL has opposed the motion to unredact the complaint. The FTC has responded by stating that the redacted material does not qualify as confidential business information, and that while disclosure of the material could cause "embarrassment" and "could 'expose respondent to possible treble damages actions,'" those reasons are not sufficient to prevent disclosure.

65.     On June 8, 2009, little more than two weeks after the FTC filed its Complaint, CSL and Talecris announced their decision to terminate the merger agreement. On June 8, 2009 CSL and Talecris also withdrew their Hart-Scott-Rodino Notification and Report Forms filed with the FTC pursuant to the proposed merger. On June 15, 2009, the FTC and CSL filed a joint motion to dismiss the Complaint.

66.     As the columnist Eli Greenblat wrote for the *Age*, an Australian news periodical: "Part of the official reason for pulling the takeover was that Talecris' private equity owners refused to give CSL more time beyond an August cut-off to seal the deal. They wanted their $US 75 million ($A 95 million) break fee and would not consider pushing back the deadline. If this is true, it must be one of the only private equity firms going that in this financial crisis prefers to run a business than have $US 3.1 billion cash in the bank." Further, "What use would it be [for CSL] to capture rival Talecris only to bring down the entire blood plasma industry on [its] head as the FTC handed to the US Department of Justice what it believed was a prima facie case of collusion and price fixing."

67.     Under the terms of the merger agreement, if the takeover was not consummated:
(1) CSL would pay $75 million to Talecris; and (2) CSL would supply Talecris with plasma for
five years.

## MASSIVE CONSOLIDATION IN THE INDUSTRY

68.     In 1990, there were thirteen Plasma-Derivative Protein Therapy manufacturers.
In 1999, the number of Plasma-Derivative Protein Therapy manufacturers was reduced to nine.
By 2005, the number of Plasma-Derivative Protein Therapy manufacturers was further
consolidated to five: CSL, Baxter, Talecris, Grifols and Octapharma.  The tight-knit firms of the
plasma industry have been likened to the "Seven Sisters" of the petroleum industry's oil cartel.

69.     Plasma-Derivative Protein Therapy manufacturers have used this massive
industry consolidation as an opportunity to engage in unlawful anticompetitive conduct.  Rather
than increasing competition, the reduction in the number of Plasma-Derivative Protein Therapy
manufacturers has increased coordination among competitors.

70.     From the late 1990's through the early 2000's, Baxter acquired a number of
biopharmaceutical companies.  In 1997, Baxter acquired Immuno International AG, a global
manufacturer of biopharmaceutical products and services for transfusion medicine.  In 2001,
Baxter acquired Sera-Tec Biologicals LP, which brought Baxter's number of plasma collection
centers to 111 worldwide.  In 2003, Baxter closed 26 plasma collection centers across the United
States, as well as a plasma fractionation facility in Michigan.  That same year, Baxter acquired
Alpha Therapeutic Corporation, but sold more plasma collection centers that had been part of the
acquisition.

71.     In 2000, CSL acquired ZLB Blood Transfusion Service from the Swiss Red Cross
and established ZLB Bioplasma.  ZLB Plasma Services (now called CSL Plasma) was
established in 2001, when CSL acquired 47 plasma collection centers and lab facilities in the

15

United States. That same year, Aventis Behring acquired 42 plasma centers. In 2004, CSL acquired Aventis Behring, combining it with ZLB Bioplasma to create ZLB Behring. Then, in 2006, ZLB Behring acquired CytoGam.

72.     In 2005, the American Red Cross ("Red Cross") exited the business, and Baxter and the Red Cross agreed that the Red Cross would supply Baxter with plasma.

73.     Richard Feinstein, Director of the FTC's Bureau of Competition, has stated that the substantial consolidation in the Plasma-Derivative Protein Therapies market, resulting in a highly concentrated market, has led to "troubling signs of coordinated behavior." Moreover, the FTC alleged in its Complaint that if the proposed CSL-Talecris acquisition were approved "with the elimination of Talecris – the one firm that has consistently and significantly expanded output in the United States – *CSL and Baxter International, Inc. ("Baxter"), would face no remaining significant obstacle in their efforts to coordinate and tighten supply conditions for the relevant products.*"

74.     As alleged in the FTC Complaint, "the industry recognizes that controlling capacity is critical to preventing price competition and that consolidation has been an effective way to eliminate or control capacity. In fact, firms in the plasma industry have used consolidation as a tool to eliminate excess capacity and reduce supply, rather than produce benefits to consumers. CSL and Baxter each have reduced capacity following past acquisitions."

75.     On April 22, 2004, Baxter announced that it would cut plasma production by 13% and close some of its plasma collection centers. This was followed less than a month later by CSL, when on May 11, 2004, it announced that it would close one-third of its blood collection centers in the U.S., just one month after it purchased the blood products business of Aventis, a former competitor. According to *Bloomberg News*, CSL's Managing Director, Brian McNamee,

explained that by reducing the supply of blood products, CSL would gain more control over prices.

## THE CONSPIRACY

76.     In the early 2000s, Defendants' profits were steadily decreasing in the Plasma-Derivative Protein Therapies market.  There were multiple players competing in the Plasma-Derivative Protein Therapies market, thus supply was ample and prices were falling.  This was beneficial to consumers of Plasma-Derivative Protein Therapies.

77.     This changed around 2004 after a period of massive industry consolidation, which resulted in a market characterized as a tight oligopoly and with opportunity for Defendants to turn the market around by concertedly manipulating output in order to raise prices.

78.     Upon information and belief, Defendants devised a plan in which they could enhance profits from the sale of Plasma-Derivative Protein Therapies.  Defendants agreed to fix, raise, maintain or stabilize prices of Plasma-Derivative Protein Therapies by restricting and/or controlling the output of such products.  They successfully effectuated this unlawful scheme by, among other things, signaling their respective behaviors to each other and sharing proprietary information between themselves.  By this conduct, Defendants artificially raised the prices of Plasma-Derivative Protein Therapies sold in the United States during the Class Period.

79.     Defendants' scheme came to light following the FTC's investigation of the industry.  According to the FTC, following the extensive consolidation in the industry, the few remaining participants "recognized that they are operating in an oligopoly in which they are better off avoiding competition, restricting supply, and raising prices."

80.     The FTC further alleged in its Complaint that "the firms are keenly aware that restrained output is profitable only if all firms cooperate."  In other words, it was not in Defendants' independent self-interest to restrain or restrict output – instead, it would be in their

best economic interest to expand output in the face of increased demand in order to gain market share from their competitors.

81.    Defendants encouraged each other to increase supply "incrementally to keep pace with demand," but no further.  As a result, Defendants refused to compete for incremental sales and thus increased market share.

82.    The FTC Complaint stated that Baxter recognized that "as long as competitors are not 'irrational' and do not 'trash price and take share,' Baxter can increase supply steadily in line with market demand and keep prices high."

83.    In order to communicate their unlawful scheme, the firms engaged in signaling – *i.e.*, the intentional sharing of competitive information for purposes of securing accommodating reactions from their competitors.  The FTC found numerous examples of signaling between the Defendants.

84.    Defendants used language at public events, among other places, that suggested the existence of an illegal price-fixing conspiracy.  This language included "friendly competitor," "understanding" between companies, "irrational" decisions, "play by the rules," and "discipline."

85.    Baxter's CFO acknowledged signaling in a recent investor call, stating:

> Why any of us would, for a very short-term gain, do anything to change [the current marketplace dynamics], I just don't see why we would. It wouldn't make sense and *from everything we read and all the signals we get, there is nothing that says anyone would do that.  I think people are very consistent in the messages they deliver*, which are pretty consistent with what we have told you today.

86.    On January 24, 2008, Baxter's CEO, Bob Parkinson, stated on a Q4 2007 earnings conference call that with respect to the plasma business, "it would seem that people [competitors] are doing what they need to do to ensure that the global demand can be met *collectively* by the industry."

18

87.     In 2006, the Department of Health and Human Services ("HHS") investigated reports that patients were having problems obtaining Ig.

88.     HHS went on to find that IGIV supplies were "being rationed" to such an extent that demand exceeded the supply of the drug by at least 14%.

89.     The HHS Report also explained that "[m]anufacturers are currently allocating IGIV to their customers. Under this allocation system, most customers are expected to justify their current IGIV use to the manufacturer to maintain and/or increase their allocations."

90.     Plasma-Derivative Protein Therapy manufacturers closely monitor each others' activities with respect to plasma collection, manufacturing and output.

91.     Competitors also shared competitively-sensitive business information with each other. In its investigation, the FTC discovered a PowerPoint presentation compiled by Talecris CEO Alberto Martinez that was essentially identical to a presentation by CSL chief economist Sam Lovkick, including 32 of 59 slides.

92.     They have developed sophisticated oligopoly models to estimate and predict changes in supply and demand.

93.     The FTC found that the manufacturers are "collecting and cataloging an extraordinary wealth of timely competitive information, to ensure that all are engaging in desired ... behavior."

94.     Defendants also spoke publicly about their desire to raise prices.

95.     On October 18, 2007, Baxter's CFO and Corporate Vice President, Rob Davis, stated on a Q3 2007 earnings conference call that with respect to Baxter's plasma business, there was going to be "price appreciation," and that Baxter expected to see "low to mid single digit price growth over our long-range horizon."

96.     Defendants' scheme worked.  As a result of their unlawful conspiracy, Defendants were able to raise prices for Plasma-Derivative Protein Therapies during the Class Period.

97.     In a recent investor call, a Baxter executive explained that after competitors lived through the "events of the early 2000s" (referring to a period of ample supply and lower prices for Plasma-Derivative Protein Therapies), they have now returned to a time of "very good stock prices and very good returns for shareholders," indicating the success of Defendants plan to increase prices by reducing supply.

98.     Similarly, at the 2007 Plasma Protein Forum, held June 5-6 at the Hyatt Regency in Reston, Virginia, and attended by numerous industry executives, including those of Defendants, Peter Turner, PPTA Chairman and President of CSL Behring, "declared the industry to be in 'good shape' after a few bumps in the road in years past."

99.     In addition, the HHS Report found that average prices for IGIV have been steadily increasing since 2004 and the upward trend was expected to continue through 2007.  For example, in 2004 the average price for liquid IGIV was approximately $44 a gram, while for the first half of 2006, the price had risen to almost $48 a gram.  By 2009, according to an analyst presentation by Grifols on March 5, 2008, the price for IVIG was projected to reach $57 a gram.

100.    The average price of Albumin has increased from about $1.25 a gram in 2005 to about $2.20 a gram, according to the same Grifols presentation.  The presentation also reports that "average albumin prices have steadily increased since 2005 from U.S. $14 to around U.S. $35 per 12.5 g. vial at present."

## OTHER MARKET FACTORS SUPPORTING
## THE EXISTENCE OF THE CONSPIRACY

101.    Various other factors make the market for Plasma-Derivative Protein Therapies

particularly susceptible to an illegal conspiracy.

### Highly Concentrated Industry

102.    A high degree of concentration facilitates the operation of a price-fixing cartel

because it makes it easier to coordinate behavior among co-conspirators, and it makes it more

difficult for customers to avoid the effects of collusive behavior.

103.    There are only five manufacturers of Plasma-Derivative Protein Therapies in the

U.S., two of which (Grifols, S.A. and Octapharma AG) have only single-digit market share and

limited ability to expand their U.S. presence.

104.    Defendants control a high percentage of the United States Plasma-Derivative

Protein Therapies industry, collectively possessing about a 60% market share.  In particular,

Baxter controls about 36% of the market, and CSL controls about 24% of the market.  The

remaining manufacturers, Talecris, Grifols, and Octapharma, possess shares of approximately

23%, 7% and 5%, respectively.

105.    With respect to the domestic Ig market, according to 2008 sales volumes,

Defendants collectively possess approximately a 62.9% market share.  CSL has about a 27.5%

market share, and Baxter has about a 35.4% market share.  The remaining manufacturers,

Talecris, Grifols, and Octapharma, possess shares of approximately 20%, 9% and 7.2%,

respectively.

106.    With respect to the domestic albumin market, accordingly to 2008 sales volumes,

Defendants collectively possess approximately a 73.05% market share.  CSL possesses about a

36.6% market share, and Baxter maintains about a 36.44% share. The remaining competitors, Talecris, Grifols, and Octapharma, possesses shares of 8.83%, 13.06%, and 5.07% respectively.

107.    At all relevant times during the Class Period, Defendants controlled most of the sales of Plasma-Derivative Protein Therapies in the United States. Both the Department of Health and Human Services and the FTC have described the Plasma-Derivative Protein Therapies market as "a tight oligopoly."

108.    The Herfindahl-Hirschman Index ("HHI") is a widely-accepted measure of industry concentration that economists often use to quantify the degree of market concentration. HHI is calculated by summing the squares of companies' individual market shares within an industry. The U.S. Department of Justice ("DOJ") considers an HHI higher than 1800 to be a highly concentrated market.

109.    Thus, the HHI for the Plasma-Derivative Protein Therapies market ranges from 2500 to over 3000, depending on the plasma product. This high HHI – well over 1800 – indicates that the Plasma-Derivative Protein Therapies market is extremely concentrated and is therefore highly susceptible to collusion by manufacturers.

**High Barriers To Entry**

110.    A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the operation of a cartel.

111.    There are significant barriers to entry in the Plasma-Derivative Protein Therapy market. In its Complaint challenging the proposed CSL – Talecris merger, the FTC alleged that each step of the Plasma-Derivative Protein Therapy manufacturing process requires substantial

22

up-front capital investments (sunk costs), "onerous and lengthy regulatory approvals", and specialized technical expertise.

112.    According to the PPTA, "the development of new plasma-derived therapies is difficult and requires significant investment from manufacturers. Considerable research efforts and dedicated resources are required in new therapeutic areas to demonstrate clinical efficacy. In addition, development and validation of new production methods for these sensitive proteins is cumbersome and costly. Often the target patient groups are very small, often recognized as "orphan drug" populations, making patient recruitment into clinical trials slow and costly and the likely return on investment uncertain."

113.    Furthermore, in their 2008 10-K, Baxter stated that their "investment in research and development is essential to its future growth and its ability to remain competitive in all three of its business segments." In 2008 alone, their investment in research and development activities was $868 million, up from $760 million in 2007. According to Lacy McMahon, Talecris' communications manager, "the plasma industry as a whole isn't an easy industry... It's very complex and requires a lot of resources." This makes entry into the Plasma-Derivative Protein Therapy market difficult.

114.    Entry into the Plasma-Derivative Protein Therapies market also requires a significant amount of intellectual property, including trade secrets relating to purification and safety, and substantial product research and development. For example, "patents and other proprietary rights are essential to Baxter's business. Baxter relies on trademarks, copyrights, trade secrets, know-how and confidentiality agreements to develop, maintain and strengthen its competitive position."

23

115.    Entry into the Plasma-Derivative Protein Therapies market is also difficult because of the significant regulatory hurdles in getting products approved by the FDA.  The FDA's regulatory requirements impose significant costs and considerable time to enter the market. The return on investment for most manufacturers takes a long time to realize, making entry into the market cost-prohibitive.  For example, Baxter's facilities, operations, employees, products and services face government regulation from a variety of agencies, including: the U.S. Food and Drug Administration, Drug Enforcement Agency, Environmental Protection Agency, Occupational Health & Safety Administration, Department of Agriculture, Department of Labor, Department of Defense, Customs and Border Protection, Department of Commerce, Department of Treasury, as well as the Center for Medicare/Medicaid Services and the Office of the Inspector General within the Department of Health and Human Services. They are also subjected to regulation from state agencies, and by international government agencies, who regulate public health, product registration, manufacturing, environmental conditions, labor, exports, imports and other aspects of the company's global operations.

116.    Because of these high barriers to entry, no new companies have entered the market *de novo* in recent history.

117.    Similar barriers preclude Talecris, Grifols and Octapharma, which have an existing, albeit small, presence in the U.S. Ig and albumin markets, from significantly expanding production in a timely manner.

118.    This market environment makes entry into the market or expansion from within unlikely to occur to a degree that is sufficient to counter the anticompetitive effects of the existing oligopoly.

<u>**Lack of Reasonable Substitutes**</u>

119.    The lack of available substitute products gives a potential cartel a greater chance of being successful.  When few or no substitutes for a price-fixed item are available, producers of the item can raise a product's price and maintain it over time without losing significant sales. Consumers have little choice but to pay the higher price.

120.    The product offerings of the Defendants are largely homogenous.

121.    There are no substitutes for Ig available in the U.S. at any price.

122.    There are no substitutes for Albumin available in the U.S. at any price. Physicians and hospitals regard Albumin as far superior from a clinical standpoint to any potential alternatives, such as hetastarch and saline products.

123.    Plasma-derivative protein products sold outside of the U.S. are not viable alternatives for U.S. customers because the FDA requires that the plasma be U.S. plasma for FDA approval of the relevant drug therapies.

<u>**Standardized Product with High Degree of Interchangeability**</u>

124.    When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier to unlawfully agree on the price for the product in question, and it is easier to effectively monitor agreed-upon prices. This makes it easier to form and sustain an unlawful cartel.

125.    For example, according to CSL's 2005 Annual Report, it has "standardized operational systems across [its] US plasma collection centers and [it is] well advanced with developing a fully integrated global plasma supply chain that will further help [it] to manage plasma inventory."  The high level of industry regulation leads to a standardization of the products sold by market participants. In the same Annual Report, CSL also stated, "in a

stringently regulated industry, [it complies] with the highest international standards and continue[s] to explore avenues for further innovation." Similarly, it stated in their 2007 Annual Report, "the largest collector of human blood plasma in the world, ZLB Plasma sources the plasma required by CSL Behring through its plasma collection operations and commercial purchases. In this stringently regulated industry, CSL Behring and ZLB Plasma meet or exceed international standards…"

126.    Pricing and other variables for Plasma-Derivative Protein Therapies are standardized. The FTC claims this "enhance[s] the high degree of transparency in the industry."

127.    Defendants' Ig Plasma-Derivative Protein Therapies are functional equivalents and essentially interchangeable.

128.    Defendants' Albumin Plasma-Derivative Protein Therapies are functional equivalents and essentially interchangeable.

## Nondurable Product

129.    It is more easier to cartelize a nondurable product market than a durable product market. In a durable market, buyers can store the product and a secondary market can operate against attempts to raise prices. Blood plasma-derived products are nondurable and can only be stored for a limited period of time. Indeed, "plasma products are as demanding as medicine gets. The proteins in the plasma that make up antibodies—and, thus, are the target of plasma processing—are fragile and easily denatured. Most important from a packaging standpoint, the cold chain must be preserved all the way from production to use."

130.    Furthermore, "plasma-based medications are extremely sensitive to heat. If they are exposed to temperatures outside specified ranges at any point in the distribution chain, it can

compromise their efficacy." According to the American Red Cross, the shelf life for [plasma] is only one year.

## Many Buyers

131.    There are numerous customers who purchase blood plasma-derived products. With many buyers, each of whom forms a small share of the marketplace, there is less incentive for cartel members to cheat on collusive pricing arrangements, since each potential sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

132.    In their 2005 10-K, Baxter states that their products are used by "hospitals, clinical and medical research laboratories, blood and plasma collection centers, kidney dialysis centers rehabilitation centers, nursing homes, doctors' offices and by patients at home under physician supervision."

133.    Baxter manufactures products in 28 countries and sells them in over 100 countries."

134.    Similarly, CSL Limited wrote in its 2007 Annual Report that it minimized "the credit risks associated with trade and other debtors by undertaking transactions with a large number of customers in various countries."

## Competition Principally on Price

135.    It is easier to implement and monitor a cartel when competition is principally on the basis of price, since price is more often objectively measurable and observable than non-price factors such as service. In its 2005 10-K, Baxter notes the importance of price to its customers: "customers will continue to work and organize to negotiate price reductions for our products and services." It also notes, "competition is primarily focused on cost-effectiveness, price, service, product performance, and technological innovation." There has been consolidation in the

company's customer base, and by its competitors, which has resulted in pricing and market share pressures."

## Similar Cost Structures and Production Processes

136.    The more similar the manufacturers in the market are with respect to their costs and their production methods, the easier it will be for them to exhibit collusive behavior. The PPTA publishes a breakdown of the blood plasma-derived products market.

137.    CSL Behring itself cites to this industry cost structure on its website. The costs of producing blood plasma-derived products are approximately 70 percent of the selling price, compared to just 25 percent for traditional chemical-based pharmaceuticals.

138.    The high level of government regulation leads to similar production processes for blood plasma-derived products. According to the PPTA, the fractionation process by which the products are created is considered "standard" in the industry. It also states that blood plasma-derived therapies "undergo an elaborate, highly regulated and well controlled manufacturing process." In its 2008 10-K, Baxter states, "the manufacture, distribution and marketing of our products are subject to extensive ongoing regulation by the FDA and other regulatory authorities both within and outside the United States." When referring to its blood plasma collection business, CSL Behring refers to the industry as "stringently regulated."

## Close Business Relationships

139.    The opportunity to conspire is enhanced where there are business relationships among competitors.

140.    Further, it is industry practice for firms to cooperate on plasma supply. For example, according to Talecris's S-1/A filed with the SEC on November 19, 2007, it obtained 33% of its plasma from CSL until June 30, 2007.

141.    In addition, pursuant to the terms of the Agreement, since the acquisition of Talecris by CSL was not consummated, CSL will supply Talecris with plasma for the next five years.

## Opportunities for Meeting Competitors

142.    Participation in trade associations can be used to foster and facilitate an unlawful conspiracy.

143.    The PPTA is an industry self-regulatory body that serves as the global representative of the world's leading plasma collectors and producers of plasma-derived and recombinant biological therapeutics.  Defendants are members of the PPTA, and thus have the opportunity to share information and conspire at meetings and events.

144.    Defendants are Global and North American Members of the PPTA, and their high-level executives, including Peter Turner, President of CSL Behring and Larry Guiheen, President of Baxter BioScience and serve on the PPTA's Global Board of Directors.  Mr. Turner also serves as the PPTA's president.

145.    In addition, the Global Management Committee of the PPTA comprises three members, including one from each Defendant; the North America Board of Directors of the PPTA comprises three members, including one from each Defendant; and the Source Board of Directors of the PPTA comprises three members, including one from each Defendant.

146.    The PPTA convenes its annual meeting, known as the Plasma Protein Forum, in June in the Washington, D.C. metropolitan area, and high-level executives from Defendants regularly attend.

### Cross-Hiring of Senior Personnel

147.    Among the five Plasma-Derivative Protein Therapy manufacturers, including Defendants, there is a great deal of inter-company hiring.  Competitors hire high-level employees who formerly held strategic positions with their competitor.

148.    For example, Dr. Alberto Martinez, Talecris's CEO, was previously employed by CSL, where he served first as Executive Vice President and later as Head of Global Commercial Operations for its subsidiary ZLB Behring.

149.    Such conduct is particularly troublesome from a conspiracy perspective in the context of an oligopoly, such as here.  Such inter-competitor hiring facilitates the opportunity for tacit and express agreements between competitors.

### Record of Antitrust Inquiry

150.    One of the factors that make the existence of a collusive pricing arrangement more likely is a record of antitrust inquiry. In May 2009, The Federal Trade Commission authorized a lawsuit to block CSL's proposed $3.1 billion merger with Talecris. As part of their investigation, the FTC noted that the market has exhibited "troubling signs of coordinated behavior" and that Baxter and CSL had made "efforts to coordinate and tighten supply conditions" for Plasma-Derivative Protein Therapies.

### ALLEGATIONS OF ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

151.    Defendants' unlawful conspiracy had and is having the following effects, among others:

    a.    prices charged to Plaintiff and the Class for Plasma-Derivative Protein Therapies have been fixed, maintained, or stabilized at higher, artificially derived, non-competitive levels;

b.        Plaintiff and the Class have been deprived of the benefits of free, open and

unrestricted competition in the sale of Plasma-Derivative Protein Therapies; and

c.        competition in establishing Plasma-Derivative Protein Therapies prices in

the United States has been unlawfully restrained, suppressed and eliminated.

152.    By reason of Defendants' violations of Section 1 of the Sherman Act and Section

4 of the Clayton Act, Plaintiff and the Class have sustained injury to their business or property.

The injury sustained by Plaintiff and the Class is the payment of supra-competitive prices for

Plasma-Derivative Protein Therapies.  This is an injury of the type that the antitrust laws were

meant to punish, prevent, and redress.

### FRAUDULENT CONCEALMENT

153.    Defendants fraudulently concealed their participation in the conspiracy alleged

by, among other things, engaging in secret communications in furtherance of the conspiracy, and

by holding themselves out as competitors to the public, to Plaintiff, and to the Class.  Because of

such fraudulent concealment, and the fact that a price-fixing conspiracy is inherently self-

concealing, Plaintiff and the Class could not have discovered the existence of this conspiracy any

earlier than its public disclosure.

### COUNT ONE

### VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

154.    Plaintiff incorporates by reference the preceding allegations.

155.    Defendants and their unnamed co-conspirators entered into and engaged in a

conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

156.    The conspiracy consisted of a continuing agreement, understanding or concerted

action between and among Defendants and their co-conspirators to fix, maintain, raise and/or

stabilized prices of Plasma-Derivative Protein Therapies in the United States by, among other

things, restricting or controlling output. Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

157.    As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury in that they have paid supra-competitive prices for Plasma-Derivative Protein Therapies.

## **RELIEF SOUGHT**

Accordingly, Plaintiff demands relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be appointed as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.    That the unlawful conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce, in violation of Section 1 of the Sherman Act;

C.    That Plaintiff and the Class recover the damages determined to have been sustained as to each of them, trebled as provided by law, and that judgment be entered against Defendants, jointly and severally, on behalf of Plaintiff and each and every member of the Class;

D.    That Plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

E.    That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.


Dated:  August 20, 2009                          Respectfully submitted,



                                                 /s/ Douglas A. Millen
                                                 Michael J. Freed
                                                 Steven A. Kanner
                                                 Douglas A. Millen
                                                 **FREED KANNER LONDON & MILLEN LLC**
                                                 2201 Waukegan Road, Suite 130
                                                 Bannockburn, IL  60015
                                                 Tel:  (224) 632-4500
                                                 Fax:  (224) 632-4521


                                                 Vincent J. Esades
                                                 Jessica N. Servais
                                                 **HEINS MILLS & OLSON, P.L.C.**
                                                 310 Clifton Avenue
                                                 Minneapolis, MN  55403
                                                 Tel:  (612) 338-4605
                                                 Fax:  (612) 338-4692


                                                 *Attorneys for Hospital Damas, Inc.*

## BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| IN RE PLASMA-DERIVATIVE PROTEIN THERAPIES ANTITRUST LITIGATION | : : : : : | MDL DOCKET NO. ____ |

### BRIEF IN SUPPORT OF PLAINTIFF HOSPITAL DAMAS, INC.'S MOTION FOR TRANSFER OF ACTIONS TO THE NORTHERN DISTRICT OF ILLINOIS PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS

### *Oral Argument Requested*

Hospital Damas, Inc. ("Movant"), plaintiff in an action styled *Hospital Damas, Inc. v. CSL Limited, et al.,* United States District Court for the Northern District of Illinois, Case Number 1:09-cv-5130, respectfully files this Memorandum in Support of Motion for Consolidation and Transfer of Pretrial Proceedings under 28 U.S.C. §1407 and Rule 7.2(a)(1) of the Rules of Procedure for the Judicial Panel on Multidistrict Litigation ("Panel").[1] Specifically, Movant files this Memorandum in Support of its Motion for an Order transferring all actions (the "Pending Actions") listed on the Schedule of Actions (attached as Exhibit A hereto) to the United States District Court for the Northern District of Illinois, where the Movant's action is

---

[1] Pursuant to Panel Rule 7.2(a)(ii), attached as Exhibit A to the accompanying Motion is a Schedule of Actions that Movant is seeking to consolidate and transfer.

72430

pending, for consolidated or coordinated proceedings.  Movant also respectfully requests that any subsequently filed "tag-along" actions brought in other courts be similarly transferred and consolidated under Rule 7.5 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation.

# I. BACKGROUND

The Pending Actions have been brought by direct purchasers of Plasma-Derivative Protein Therapies immune globin or albumin as class action antitrust lawsuits against CSL Limited, CSL Behring LLC and Baxter International Inc. ("Defendants").  At present, one action is pending in the Northern District of Illinois and two actions are pending in the Eastern District of Pennsylvania.  The plaintiffs in these actions seek damages and injunctive relief as a result of Defendants' unlawful price-fixing of Plasma-Derivative Protein Therapies.

Generally, plaintiffs in the Pending Actions allege that Defendants engaged in a deliberate and calculated scheme to unlawfully fix, raise, maintain or stabilize prices of Plasma-Derivative Protein Therapies by controlling the output of such products to the detriment of plaintiffs and the classes they seek to represent.

As a result of Defendants' conduct, plaintiffs in the Pending Actions have alleged violations of the federal antitrust laws on behalf of classes of direct purchasers of Plasma-Derivative Protein Therapies.  The Pending Actions necessarily share core common questions of fact, and invariably will generate duplicative and overlapping discovery requests and disputes. Accordingly, transfer and coordination or consolidation of the actions will best serve the interests of justice and efficiency by permitting a single court to coordinate discovery and resolve disputes common to the Pending Actions.  This, in turn, will avoid unnecessary taxing of the judicial system's and the litigants' finite resources.  As set forth more fully below, given, among other things, the fact that: (i) the Defendant Baxter International Inc., the leading manufacturer of Plasma-Derivative Protein Therapies, is located in the Northern District of Illinois; (ii) the Defendant CSL Behring LLC operates its U.S. manufacturing facility in nearby Kankakee, Illinois; (iii) the Northern District of Illinois has the experience, time and resources necessary to manage this complex litigation; and (iv) the Northern District of Illinois is centrally located and

convenient to all parties, transfer of the related actions to the Northern District of Illinois will best effectuate the goals of 28 U.S.C. § 1407 and Movant respectfully requests that the Panel transfer all Pending Actions there.

## II. LEGAL STANDARD

The underlying purpose of transferring related actions under 28 U.S.C. § 1407 is to serve the convenience of the parties and witnesses and promote the just and efficient adjudication of actions pending in multiple districts by providing for the centralized management of pretrial proceedings under a single court's supervision. *In re Hydrogen Peroxide Antitrust Litig.*, 374 F. Supp. 2d 1345, 1346 (J.P.M.L. 2005); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 228 F. Supp. 2d 1379, 1380 (J.P.M.L. 2002). Transferring actions to a single court pursuant to Section 1407 is appropriate where, as here, transfer will minimize duplication of discovery requests and disputes and prevent inconsistent procedural determinations by courts of coordinate jurisdiction. *In re Temporomandibular Joint (TMJ) Implant Products Liability Litig.*, 844 F. Supp. 1553, 1554 (J.P.M.L. 1994).

## III. ARGUMENT

### A.    The Litigation Satisfies the Requirements for Consolidation and Transfer Under 28 U.S.C. § 1407

Pretrial transfer and consolidation under Section 1407 is appropriate and necessary for this litigation. The Pending Actions involve similar antitrust allegations and legal standards, and they are numerous. Unless these cases are consolidated, the parties will incur unnecessary and excessive costs due to duplicative discovery, and will face the risk of inconsistent rulings on a variety of issues.

### 1.      The Litigation Involves Common Questions of Fact

A key factor for transferability and coordination under Section 1407 is the presence of common questions of fact. *In re Federal Election Campaign Act Litig.*, 511 F. Supp. 821, 823 (J.P.M.L. 1979).  In assessing the appropriateness of consolidation under Section 1407, the Panel looks to the pleadings to determine the extent that common questions of fact are present.  The Panel has ordered the transfer and consolidation of actions whose complaints contained "substantially similar" and "virtually identical allegations of fraudulent conduct." *In re Industrial Wine Contracts Securities Litig.*, 386 F. Supp. 909, 911 (J.P.M.L. 1975) (per curiam).

The complaints in the Pending Actions clearly present common questions of fact. Each complaint is based on Defendants' alleged unlawful acts of fixing, raising, maintaining or stabilizing prices for Plasma-Derivative Protein Therapies and seeks overcharge damages on behalf of classes of direct purchasers of Plasma-Derivative Protein Therapies.  For example, all of the complaints allege that due to the unlawful acts of Defendants, prices for Plasma-Derivative Protein Therapies have been and are higher than would be the case absent Defendants' anticompetitive conduct, causing damages to the plaintiffs and the classes they seek to represent.

The Pending Actions thus satisfy 28 U.S.C. § 1407's threshold requirement that civil actions appropriate for transfer share one or more common questions of fact.  Such issues include:

- Whether Defendants have engaged in contracts, combinations, or a conspiracy to illegally fix, raise, maintain or stabilize prices of Plasma-Derivative Protein Therapies;

- Whether plaintiffs and members of the classes were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for respective class members; and

- Whether plaintiffs and members of the classes are entitled to, among other things, equitable relief.

Moreover, as the Pending Actions at issue are antitrust class actions, they present exactly the type of complex litigation for which consolidation was intended. *In re Multidistrict Private Civil Treble Damage Antitrust Litigation Involving IBM*, 302 F. Supp. 796, 799 (J.P.M.L. 1969).

### 2.     The Parties Face Duplicative Discovery Absent Transfer and Consolidation

Because the allegations regarding Defendants in all of the Pending Actions are very similar, the parties in these cases face duplicative discovery if these cases are not consolidated and transferred.   This is an important consideration for the Panel in that transfer and consolidation "ensure[s] that the actions are supervised by a single judge who, from day-to-day contact with all aspects of the litigation, will be in the best position to design a pretrial program that will prevent duplicative discovery, eliminate the possibility of conflicting rulings and substantially conserve the time and efforts of the parties, the witnesses and the federal judiciary." *In re Resource Exploration, Inc. Securities Litig.*, 483 F.Supp. 817, 821 (J.P.M.L. 1980).

The parties in these actions will clearly engage in duplicative discovery absent consolidation.   All plaintiffs will be seeking the same documentation and discovery from Defendants.  Similarly, Defendants will likely raise the same discovery objections and seek the same protective orders and privileges in each Pending Action. However, if the Panel consolidates and transfers the cases, the parties will coordinate their efforts and thus avoid duplicative discovery disputes that will strain the resources of the parties, witnesses and the judiciary.

### 3.     Transfer and Consolidation Will Prevent Inconsistent Pretrial Rulings

In assessing the appropriateness of consolidation, the Panel often considers the possibility of inconsistent rulings on pretrial issues because of the possible res judicata or collateral estoppel effects on other cases. For example, the Panel granted a transfer in part to prevent inconsistent pretrial rulings in *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 196 F. Supp. 2d

1375, 1376 (J.P.M.L. 2002). *See id.* ("Centralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings (especially with respect to questions of class certification), and conserve the resources of the parties, their counsel and the judiciary."). Because the similarity of the allegations in the Pending Actions, including the fact that plaintiffs seek to represent a similarly defined class, a strong likelihood of inconsistent rulings would exist should the Pending Actions not be consolidated. Defendants are likely to present the same pretrial motions in each action and assert the same discovery objections and privileges. Inconsistent rulings would pose a serious problem because the factual and legal allegations are virtually identical in each Pending Action.

Transfer and consolidation are appropriate in these circumstances because they will promote the just and efficient conduct of the litigation from the very outset for all Pending Actions. Centralized pretrial proceedings will eliminate the possibility of conflicting rulings in parallel proceedings that may interfere with the orderly administration of justice. *See In re Hotel Tel. Charge Antitrust Litig.*, 341 F. Supp. 771, 772 (J.P.M.L. 1972) ("We have frequently held that . . . threat of inconsistent judicial decisions of discovery, class and other issues requires transfer of multidistrict litigation to a single judge under Section 1407.") (citations omitted). Absent consolidation and coordination before a single court, different judges may reach conflicting decisions regarding critical issues such as class certification. The Panel has consistently found that transfer of actions to a single district court for consolidated or coordinated pretrial proceedings is appropriate where, as here, the risk of inconsistent class determinations exists. *See In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig.*, 424 F. Supp. 504, 507 (J.P.M.L. 1976) ("matters concerning class action certification should be included in the coordinated or consolidated pretrial proceedings in order to prevent inconsistent

rulings and promote judicial efficiency"); *In re Roadway Express, Inc. Employment Practices Litig.*, 384 F. Supp. 612, 613 (J.P.M.L. 1974) ("Secondly, and perhaps crucially, the conflicting and overlapping class allegations contained in the complaints raise the indubitable possibility of inconsistent class determinations by courts of coordinate jurisdiction. We have consistently held that the existence of and the need to eliminate this possibility presents a highly persuasive reason favoring transfer under Section 1407.").

### 4.    There is Sufficient Numerosity to Support Transfer and Consolidation

There are currently three cases pending before different judges in two separate jurisdictions. Other cases will likely be filed as well. The Panel has routinely ordered consolidation and transfer of three or fewer cases. *In re Philadelphia Life Ins. Co. Sales Practices Litig.,* 149 F. Supp. 2d 937, 938 (J.P.M.L. 2001) (granting transfer and consolidation of two cases); *In re Amoxicillin Patent & Antitrust Litig.,* 449 F. Supp. 601, 603 (J.P.M.L. 1978) (granting transfer and consolidation of three cases involving complex patent and antitrust issues); *In re Alodex Corp. Securities Litig.,* 380 F. Supp. 790, 791 (J.P.M.L. 1974) (granting transfer and consolidation of three cases); *In re CBS Licensing Antitrust Litig.*, 328 F. Supp. 511 (J.P.M.L. 1971) (granting transfer and consolidation of two cases). Moreover, where, as here, the actions share numerous complex questions of fact, the Panel has consolidated a relatively small number of actions. For example, in *In re First Nat'l Bank, Heavener, Okla. (First Mortgage Revenue Bonds) Sec. Litig.*, 451 F. Supp. 995 (J.P.M.L. 1978), the Panel consolidated two actions that arose from the same factual allegations and shared numerous "complex questions of fact." *Id.* at 997. Accordingly, a sufficient number of actions exist to support the transfer and consolidation of the Pending Actions.

**B.      The Northern District of Illinois is the Appropriate Transferee Forum**

An analysis of the applicable facts and relevant case law reveals that the Northern District of Illinois is the best choice for transfer and consolidation and/or coordination of pretrial proceedings. As Defendants have not filed a responsive pleading in any Pending Action, all Pending Actions are in their infancy and thus the Panel can determine the appropriate transferee court based on which district has a geographic nexus to the facts at issue and which district can minimize the costs and inconvenience for all parties.  As more fully explained below, the Northern District of Illinois is the most appropriate transferee court as: (i) the largest Defendant, the leading manufacturer of Plasma-Derivative Protein Therapies—Baxter International—is headquartered in the Northern District of Illinois; (ii) Defendant CSL Behring LLC operates its U.S. manufacturing facility in nearby Kankakee, Illinois; (iii) the Northern District of Illinois has the experience, time and resources to manage this complex litigation; and (iv) the Northern District of Illinois is centrally located and convenient to all parties.

**1.      The Principal Defendant, Baxter, is Located in the Northern District of Illinois and Defendant CSL Behring LLC Operates its U.S. Manufacturing Facility in Illinois; Thus, This District Has a Geographic Nexus to the Facts at Issue**

Defendant Baxter International— the leading manufacturer of Plasma-Derivative Protein Therapies—is located and headquartered in Deerfield, Illinois, approximately thirty miles from the United States District Court for the Northern District of Illinois in Chicago.

Where, as here, a principal defendant is located in or near a potential transferee court and substantial discovery is likely to take place in this jurisdiction, the Panel has found that this geographic nexus favors transfer to this jurisdiction. *See In re Webloyalty.com, Inc., Marketing and Sales Practices Litig.*, 474 F. Supp. 2d 1353, 1354 (J.P.M.L. 2007) ("The Panel is persuaded

that the District of Massachusetts is an appropriate transferee district for this litigation. Webloyalty is headquartered nearby and it is likely to be the source of a substantial number of witnesses and documents subject to discovery."); *In re CertainTeed Corp. Roofing Shingle Prods. Liability Litig.*, 474 F. Supp. 2d 1357, 1358 (J.P.M.L. 2007) (transferring to district which encompassed "the headquarters of the common defendant"); *In re Digital Music Antitrust Litig.*, 444 F. Supp. 2d 1351, 1352 (J.P.M.L. 2006) (transferring to district because, *inter alia*, "[m]ost defendants are headquartered [there], and some of the relevant witnesses and documents may be located there"); *In re Ditropan XL Antitrust Litig.*, 429 F. Supp. 2d 1364, 1366 (J.P.M.L. 2006) (transferring to district because, *inter alia*, "many of the relevant witnesses and documents are likely located in this district, where [defendant] is based"); *In re Live Concert Antitrust Litig.*, 429 F. Supp. 2d 1363, 1364  (J.P.M.L. 2006) (transferring to district because, *inter alia*, it was "likely that a substantial number of witnesses and documents" were located there because the defendant whose conduct was at issue was located there); *In re Hypodermic Products Antitrust Litig.*, 408 F. Supp. 2d 1356, 1357 (J.P.M.L. 2006) (transferring to district which was the location of the sole common defendant); *In re Hydrogen Peroxide Antitrust Litig.*, 374 F. Supp. 2d 1345, 1346 (J.P.M.L. 2005) (transferring to district because, *inter alia*, it had "a nexus to the litigation" given the presence of two of the defendants in the jurisdiction).

Likewise, Defendant CSL Behring LLC operates its U.S. manufacturing facility in nearby Kankakee, Illinois, approximately sixty miles from the United States District Court for the Northern District of Illinois.  *See In re Webloyalty.com*, 474 F.Supp.2d at 1354 (transferring three pending actions to a district where a defendant was located nearby).

In the instant litigation, many witnesses and documents will likely be found in or near the Northern District of Illinois and thus major discovery issues will likely arise in this jurisdiction.

This core geographic nexus to the litigation strongly favors transfer to the Northern District of Illinois.

### 2.  The Northern District of Illinois Has the Experience, Time and Resources to Manage This Complex Litigation

In choosing an appropriate transferee court, the Panel often examines whether the candidate forums have the necessary experience, time and resources to manage the litigation at issue.  The Northern District of Illinois has the resources to devote the time to pretrial matters that this litigation is likely to require.  The potential strain placed on the transferee Court's docket and resources is an important consideration, and one that militates in favor of the Northern District of Illinois.  Given the nexus to the facts at issue and the ability and resources of the Northern District of Illinois, and the absence of such a substantial nexus to any other District, Movant respectfully submits that the Northern District of Illinois should be selected as the transferee Court.

### 3.  The Northern District of Illinois Is An Accessible, Geographically Central, Metropolitan District Convenient to the Litigants and Witnesses

In addition to being the Court with a strong nexus to this litigation, the Northern District of Illinois provides a central location allowing easy access for all litigants and witnesses.  As previously noted, a major Defendant, Baxter International, the leading manufacturer of Plasma-Derivative Protein Therapies, is headquartered in the Northern District of Illinois.  Likewise, Defendant CSL Behring LLC's U.S. manufacturing facility is located near the Northern District of Illinois.

The Panel routinely assesses the ease of access to the transferee forum in selecting the transferee forum.  *In re AirCrash Near Van Cleve, Miss., On August 13, 1977*, 486 F. Supp. 926, 928 (J.P.M.L. 1980); *In re A.H. Robins Co., Inc. "Dalkon Shield" IUD Prods. Liab. Litig.*, 406

F. Supp. 540, 543 (J.P.M.L. 1981).  For the parties not within driving distance of Chicago, Chicago O'Hare International Airport is one of America's best-connected airports.  Over 70 million people a year travel through Chicago O'Hare International Airport, which was voted "Best Airport in North America" for 10 years by international travelers surveyed in *Business Traveler* magazine.  O'Hare provides convenient access from all points of the nation due to its geographically central location.  Notably, direct flights are currently available from almost all major cities in the United States.  Thus, the Northern District of Illinois, sitting in Chicago would be a convenient transferee site for those parties and witnesses that are not already located within driving distance of the District including parties and witnesses that may be located on either the East or West Coasts.  Here, the principal defendant, Baxter International, is headquartered in the Northern District of Illinois, Defendant CSL Behring operates in the state of Illinois and this District is also uniquely accessible and convenient to all litigants and witnesses.

## IV. CONCLUSION

Because the Pending Actions are in their infancy and Defendants have yet to even file a responsive pleading in any of the cases, the Panel should transfer and consolidate the Pending Actions to a forum that has a substantial nexus to the factual allegations at issue and has the ability, time and resources to manage this complex litigation.  Because (i) the principal defendant, Baxter International Inc., is found in the Northern District of Illinois; (ii) the Defendant CSL Behring operates its U.S. manufacturing facility in nearby Kankakee, Illinois; (iii) the Northern District of Illinois has the resources and ability to manage this litigation; and (iv) the Northern District of Illinois is convenient to and accessible by all litigants and witnesses, Movant respectfully submits that the Northern District of Illinois is the most appropriate forum for consolidation or coordination.  Accordingly, Movant respectfully requests that the Panel

transfer the Pending Actions under 28 U.S.C. § 1407 for coordination and/or consolidation in the Northern District of Illinois.

Dated:  August 21, 2009

Respectfully submitted,

**HEINS MILLS & OLSON, P.L.C.**

Vincent J. Esades
Jessica N. Servais
310 Clifton Avenue
Minneapolis, MN  55403
Tel:  (612) 338-4605
Fax:  (612) 338-4692

**FREED KANNER LONDON & MILLEN, LLC**
Michael J. Freed
Steven A. Kanner
Doug A. Millen
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015
Telephone:  (224) 632-4500

72430

13

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 2 6 2009

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE PLASMA-DERIVATIVE PROTEIN THERAPIES ANTITRUST LITIGATION | MDL DOCKET NO. ____ |

## EXHIBIT A
## SCHEDULE OF ACTIONS

| Caption | Date Filed | Case No. | District | Judge |
|---|---|---|---|---|
| **Plaintiff:** Pemiscot Memorial Hospital  **Defendants:** CSL Limited CSL Behring LLC Baxter International Inc. | 07/17/2009 | 2:09-cv-03143 | E.D. Pa. | Gene E. K. Pratter |
| **Plaintiff:** Solaris Health Systems  **Defendants:** Baxter International Inc. CSL Limited CSL Behring, LLC | 07/24/2009 | 2:09-cv-03342 | E.D. Pa. | Berle M. Schiller |
| **Plaintiff:** Hospital Damas, Inc.  **Defendants:** CSL Limited CSL Behring LLC Baxter International Inc. | 08/20/2009 | 1:09-cv-05130 | N.D. Ill. | Joan B. Gottschall |

72449

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 2 6 2009

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| IN RE PLASMA-DERIVATIVE PROTEIN THERAPIES ANTITRUST LITIGATION | : : : : : | MDL DOCKET NO. ____ |

### CERTIFICATE OF SERVICE

I, Vincent J. Esades, hereby certify that on August 21, 2009, I caused copies of the

following documents to be served upon the counsel and parties listed on the attached service list,

via U.S. Mail first class delivery:

(1)   Motion of Plaintiff Hospital Damas, Inc. for Transfer of Actions to the Northern District of Illinois Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings;

(2)   Brief in Support of Plaintiff Hospital Damas, Inc.'s Motion for Transfer of Actions to the Northern District of Illinois Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings

(3)   Schedule of Actions and Copies of Complaints (Exhibits A-D)

(4)   Certificate of Service

and upon the Clerks of Court for the U.S. District Courts for the Northern District of Illinois and

the Eastern District of Pennsylvania via U.S. Mail first class delivery or via the Court's

Electronic Court Filing system.

Dated:  August 21, 2009



Vincent J. Esades
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
(612) 338-4605 (telephone)
(612) 338-4692 (facsimile)
vesades@heinsmills.com

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 2 6 2009

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

|  |  |  |
|---|---|---|
| IN RE PLASMA-DERIVATIVE PROTEIN THERAPIES ANTITRUST LITIGATION | : : : : : | MDL DOCKET NO. ____ |

**NOTICE OF APPEARANCE**

**TO THE CLERK OF THE PANEL:**

Please enter my appearance on behalf of Plaintiff Hospital Damas, Inc.

The short case caption is *Hospital Damas, Inc., v. CSL Limited*, et al., No. 1:09-cv-05130,

N.D. Ill. (filed August 20, 2009).

Dated: August 21, 2009                 Respectfully submitted,

                                       **HEINS MILLS & OLSON, P.L.C.**

                         By: _____
                                       Vincent J. Esades
                                       310 Clifton Avenue
                                       Minneapolis, MN 55403
                                       Telephone: (612) 338-4605
                                       Facsimile: (612) 338-4692
                                       vesades@heinsmills.com

72448

# BEFORE THE JUDICIAL PANEL
# ON MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| IN RE PLASMA-DERIVATIVE PROTEIN THERAPIES ANTITRUST LITIGATION | : : : | MDL DOCKET NO. ____ |

## SERVICE LIST

Michael J. Freed
Steven A. Kanner
Doug A. Millen
Freed Kanner London & Millen, LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015
Tel:  (224) 632-4500
**Attorneys for Plaintiff Hospital Damas, Inc.**

Marc I. Machiz
Cohen, Milstein, Sellers & Toll, P.L.L.C.
255 South 17th Street, Suite 1307
Philadelphia , Pa 19103
Tel: (267) 773-4680
Fax: (267) 773-4690
**Attorney for Plaintiff Pemiscot Memorial Hospital**

Daniel A. Small
Richard A. Koffman
Kit A. Pierson
Benjamin D. Brown
Christopher J. Cormier
Cohen, Milstein, Sellers & Toll, P.L.L.C.
1100 New York Avenue, NW
Suite 500 West
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
**Attorneys for Plaintiff Pemiscot Memorial Hospital**

Mike Ponder
Cook, Barkett, Maguire & Ponder, L.C.
715 N. Clark
P.O. Box 1180
Cape Girardeau, MO 63702
Tel: (573) 335-6651
Fax: (573) 335-6182
**Attorney for Plaintiff Pemiscot Memorial Hospital**

Donald E. Haviland, Jr.
Robert G. Hughes
Michael J. Lorusso
The Haviland Law Firm, LLC
111 S. Independence Mall East, Suite 1000
Philadelphia, PA 19106
Tel: (215) 609-4661
Fax: (215) 392-4400
**Attorneys for Plaintiff Solaris Health Systems**

Barry R. Eichen
William O. Crutchlow
Christian R. Mastondrea
Eichen, Levinson & Crutchlow
40 Ethel Road
Edison, NJ 08817
Tel: (732) 777-0100
Fax: (732) 248-8273
**Attorneys for Plaintiff Solaris Health Systems**

Edward D. Rogers
Emily M. Heersink
Robert R. Baron, Jr.
Ballard Spahr Andrews & Ingersoll
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel: (215) 665-8500
Fax: (215) 864-8999
**Attorneys for CSL Behring LLC**

Heather M. Boylan Clark
Jones Day
500 Grant Street, Suite 3100
Pittsburgh, Pa 15219
Tel: (412) 394-7259
Fax: (412) 394-7959
**Attorney for Baxter International Inc.**

Arman Y. Oruc
Brijesh P. Dave
Simpson Thacher & Bartlett LLP
1155 F Street, NW
Washington, DC 20004
Tel: (202) 636-5500
**Attorneys for CSL Limited**
(Plaintiff Hospital Damas, Inc. has requested
that counsel listed above accept service on
behalf of CSL Limited)

CSL Behring LLC
Legal Department
1020 First Avenue
King of Prussia, PA 19406

Baxter International
One Baxter Parkway
Deerfield, IL 60015
c/o C T Corporation System
208 S. LaSalle St., Suite 814
Chicago, IL 60604

Michael W. Dobbins
Clerk of Court
U.S. District Court
Northern District of Illinois
Everett McKinley Dirksen
United States Courthouse
219 South Dearborn Street
Chicago, IL 60604

Michael E. Kunz
Clerk of Court
U.S. District Court
Eastern District of Pennsylvania
James A. Byrne Federal Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106-1797